Larry CUTTER, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A02–9408–CR–468.

Court of Appeals of Indiana,
Second District.

Feb. 15, 1995.

Transfer Denied May 11, 1995.

Ellen M. O'Connor, Indianapolis, for appellant.

Pamela Carter, Atty. Gen., Christopher L. Lafuse, Deputy Atty. Gen., Indianapolis, for appellee.

**OPINION**

FRIEDLANDER, Judge.

On December 11, 1992, Larry Cutter was charged with the murder of Linda Berry. On December 15, 1992, Cutter entered a plea of not guilty and discovery ensued on December 23, 1992. On May 9, 1994, Cutter filed a motion to suppress evidence, based upon multiple grounds. On June 28, 1994, the court denied Cutter's motion after a three-day hearing. This case comes before us upon interlocutory appeal of the denial of Cutter's motion to suppress. Cutter presents the following consolidated and restated issues for review:

I. Was the search warrant invalid because it did not comply with statutory provisions governing the issuance of search warrants?

II. Was the search warrant supported by probable cause?

III. Assuming *arguendo* that the warrant was not supported by probable cause, was the search nevertheless valid because the officers who executed it acted in good faith reliance upon the warrant?

We affirm.

On the evening of Friday, December 4, 1992, a woman summoned police after discovering the body of a woman lying along the muddy shore of the White River in Delaware County. The deceased woman was found lying on her back, with her legs straight and her arms extended over her head. The jeans which the woman was wearing were pulled down to her knees and her blouse was pulled up. The woman's body lacked underwear, shoes, clothing and teeth. Police investigators observed that the body bore strangulation marks upon the neck. Police soon determined through fingerprint identification that the body was that of Linda Berry, who was last seen alive the previous Saturday night at a tavern in Indianapolis. In view of the issues presented by Cutter, the events of the police investigation are of particular importance and will be set out in detail.

Detective Robert Crabbs of the Delaware County Police Department (DCPD) was called to the scene and commenced his inves-

tigation before Berry's body was moved. Crabbs determined that the body had been dragged to the spot where it was found. Crabbs also observed tire tracks indicating that a vehicle had been present and had gotten stuck in the mud several times. Crabbs immediately interviewed Cathy Armstrong, the woman who had discovered the body, but Armstrong was unable to provide further information.

The DCPD issued a state-wide dispatch containing a physical description of the body and requesting assistance from other law enforcement agencies in establishing the identity of the deceased. Crabbs received a response concerning a missing person investigation from the Indianapolis Police Department (IPD) and, late in the evening of December 4 or in the early morning hours of December 5, drove to IPD headquarters in Indianapolis. Upon arrival, Crabbs met with IPD detectives Wilson and Wininger to "compare notes" and view photographs.

Based upon his discussion with the IPD detectives, and after viewing photographs, Crabbs determined that the body was that of Linda Berry. The IPD detectives informed Crabbs that their missing person investigation revealed that Berry was last seen at an Indianapolis tavern late on the previous Saturday night, November 28. According to Wilson and Wininger, Berry and several other people, including Cutter, had been sitting at a table in the tavern and drinking. The IPD detectives had interviewed the people drinking with Berry and Cutter. Although it appears that the witnesses did not know Cutter or Berry by name, the witnesses were able to provide physical descriptions of both. According to Wilson and Wininger, at least some of the witnesses, probably three, saw Berry and Cutter leave the tavern together and get into Cutter's car. The witnesses were able to describe Cutter's car.

Prior to Crabbs's arrival, Wininger and Wilson had obtained Cutter's consent to search his car in connection with the missing person investigation involving Berry. Wilson and Wininger reported that Berry's roommate had provided a description of the clothing and jewelry Berry was wearing when she was last seen. Cutter's car had been im-pounded in order to search for the items described by Berry's roommate. The search of Cutter's car was performed by a technician, and not Wilson or Wininger. When Crabbs traveled to Indianapolis, the car was still impounded pursuant to Cutter's waiver. At the conclusion of the meeting, Crabbs obtained Berry's fingerprints from IPD files and went with Wilson and Wininger to view Cutter's car.

When Crabbs, Wininger, and Wilson arrived at the garage, the technician was still searching the car. Crabbs noted that the inside of the car was cluttered and messy and the outside was muddy. Crabbs instructed the technician to take photographs of the car and remove dirt and carpet samples. Crabbs left the garage and drove back to Muncie at about the same time that Cutter's car was released to Cutter.

Upon returning to Muncie, Crabbs interviewed Jack Jarrett, the owner of the property upon which Berry's body was found. Jarrett, a former police officer, reported that on Monday, November 30, he was in his field when he saw a car, whose description generally matched that of Cutter's car, drive down a lane and stop in the area where Berry's body was found. Crabbs showed a picture of Cutter's car to Jarrett, and Jarrett stated it was "similar" to the car he had seen in the lane. *Record* at 1273. Jarrett reported that the car had gotten stuck in the mud several times while attempting to leave the property.

Later that day, December 5, Crabbs reviewed all of the reports and discussed the case with his captain, Jerry Cook. Cook determined that they should apply for a search warrant. Crabbs and Cook called Prosecutor Richard Reed, who came immediately to the police station. Reed called Judge Barnet late on the evening of December 5 requesting a search warrant.

Reed taped the conversation. Detective Crabbs was sworn, but Reed was not. Reed proceeded to question Crabbs as follows:

> "Q: Officer Crabbs, did you have occasion to participate in the investigation discovery of a deceased human being here in Delaware County yesterday?
>
> A: I did.

Q: Tell the Court what you saw.

A: Just north of County Road 300 South, west of State Road 32, up a lane approximately a quarter of a mile, and east of White River, was a body of a white female, partially clothed along the river bank approximately four or five feet from the waters [sic] edge.

Q: And you say partially clothed, was there evidence of sexual connotations to the discovery of the body?

A: That has been proved through an autopsy, yes." *Record* at 1536.

\* \* \* \* \* \*

"Q: And have you had occasion through investigation by The Indianapolis Police Department and others to determine when she was last seen alive?

A: According to detectives at the Indianapolis Police Department, missing person's division, Wilson and Winegar [sic], who were investigating the missing person of one said Linda Berry, they have a report on file and through the fingerprints have identified her as that person.

Q: Have they taken statements from witnesses who last saw her alive in the presence of another person?

A: They have taken statements from those people, yes.

Q: Do you know those people's names?

A: No, I do not.

Q: How many people are there that have reported seeing her alive?

A: Five (5) people.

Q: And those five (5) people have indicated she was in the presence, she had left a tavern in Indianapolis, is that correct?

A: That's correct.

Q: And in the company of who?

A: In the company of one Mr. Cutter.

Q: Is that Larry Cutter?

A: Larry Cutter." *Record* at 1537–8.

Crabbs testified that detectives Wilson and Wininger had spoken with Cutter, who had signed a consent for the police to search his car. Crabbs reported that he had seen the vehicle and noted that it was very muddy, and that it was cluttered inside, with "a lot of things strewn around inside the car laying in the floor." *Record* at 1539. Crabbs further testified:

"Q: Are you concerned also with attempting to locate a women's blue jean jacket with a white fleece lining, a gold necklace with a half-moon pendant, an Irish friendship ring which matches a ring worn by the victim's roommate and some women's white Reebok tennis shoes?

A: That's correct. All those items were reported as being worn by the victim at the time she turned up missing.

Q: Who reported that?

A: The roommate of the victim.

Q: And do you know that person's name.

A: No, I don't." *Record* at 1539–40.

Reed then described Cutter's vehicle and house and asked Crabbs if he wanted to search them, to which Crabbs responded in the affirmative. Reed questioned Crabbs about his interview with Jarrett as follows:

"Q: And with respect to the automobile itself have you also talked to a witness who actually saw that automobile parked on the lane?

A: I talked today and took a statement from Jack Jarrett (sp) who is the owner of the property where the body was found who on Monday, 11/29 [sic] of '82—of '92, did observe that vehicle approximately a quarter of a mile off of the road on that lane.

Q: And did he tell you about observing that vehicle leave those premises apparently in a hurry and get stuck several times?

A: The subject, in trying to back out, got stuck several times; did finally make it to the road and went west on 300 West to 850 or 300 South to 850 West, then north past the old cemetery." *Record* at 1543.

After Crabbs completed his testimony, Judge Barnet recited the warrant, which Reed read into the record as follows:

"State of Indiana, Delaware County, SS: Search Warrant. In the Superior Court # 1 of Delaware County, the Honorable Robert Barnet, Jr., issuing Judge. To any Police Officer, Sheriff, or any Conservator of the Peace, Greetings: You are hereby authorized and directed to search for and seize the following property: 1979 Mercury Cougar, burgundy over brown in color, bearing Indiana registration 41F2297, this being a vehicle owned and maintained by Larry Cutter, 1122 North Dearborn Street, Indianapolis, Indiana; head hair, pubic hair, saliva, blood and fingernail specimens of Larry Cutter; women's blue jean jacket with white fleece lining, gold necklace with half-moon pendant, Irish friendship ring which matches a ring owned by the victim's roommate, women's white Reebok tennis shoes. You are hereby authorized and directed to search the following premises: 1122 North Dearborn Street, Indianapolis, Indiana, Marion County, this being the listed residence of Larry Cutter, Thomas Hogue and Don Lynch, a one and a half (1 1/2) story white aluminum sided wood frame building with black trim and a green roof. Also an unattached three (3) car, two (2) story block construction garage and the person of Larry Cutter. This warrant may be executed in the daytime or the nighttime. This Court hereby specifically determines that there exists probable cause to believe that the property to be seized is located at the premises herein above described, the sole basis for such determination being the sworn testimony of Officer Robert E. Crabbs. This warrant is issued pursuant to the foregoing testimony, may be executed by any Constable, Police Officer, Sheriff or Conservator of the Peace within a reasonable time of the issuance thereof. The goods and chattels or any part thereof described in the testimony and found as a result of the search shall be brought to my office as soon as possible, to be disposed of according to law. Given under my hand this 5th day of December, 1991, Robert Barnet, Jr., Judge, Superior Court No. 1 of Delaware County by Richard Reed, Prosecuting Attorney." *Record* at 1346–49.

Judge Barnet directed Reed to correct the date from "1991" to "1992" and authorized the issuance of the warrant.

On December 6, Crabbs and other DCPD officers served the warrant. When police arrived, Cutter was not home, so they spoke with his roommates and searched the house and garage, seizing a Hamm's beer bottle, a grocery sack with the name "Ebby's" printed thereon, and a pair of men's tennis shoes. When Cutter arrived home, he was taken to Wishard Hospital, where blood, hair, saliva, and fingernail samples were taken. Cutter was then taken to Indianapolis Police Department headquarters and photographed. After the photograph was taken, Cutter was returned to his house. Cutter's car was towed to Delaware County and searched by DCPD officers, who seized sweepings, soil samples, tires, a blue jean jacket, seat fabric, and fingernail pieces. Charges were filed against Cutter on December 11. The taped conversation between Judge Barnet and Reed and Crabbs was delivered by Crabbs to the Delaware County Court, where it was transcribed and has remained until the present.

On May 9, 1994, Cutter filed a Motion to Suppress on grounds that, among other things, the State had not established probable cause to issue the warrant. On May 19, 1994, Judge Barnet discovered that Officer Crabbs had never signed the transcript of the probable cause hearing and Judge Barnet had never certified the tape. Judge Barnet informed defense counsel that he would correct these "oversights", to which defense counsel objected. On May 24, 1994, Judge Barnet filed an order directing the court reporter to prepare an amended transcript containing "both the signatures of the applicants for the telephonic search warrant and the certifications of the issuing Judge." *Record* at 1056. The parties to the conversation reviewed the transcript while listening to the tape to verify its accuracy. The amended transcript was admitted into evidence at the hearing on the motion to suppress. Following denial of the motion to suppress, this interlocutory appeal ensued.

## I.

Cutter contends that the search warrant failed to comply with Ind.Code 35–33–5–3, the statute governing the issuance of search warrants, in four respects. According to Cutter, the warrant did not: 1) sufficiently identify Cutter; 2) allege the crime that had occurred; 3) describe the property to be seized with sufficient specificity; and 4) authorize seizure of Cutter to remove bodily samples.

■ Cutter contends that the search warrant was defective because it did not "particularly describe" him. Appellant's Brief at 20. A warrant authorizing the search of a person must be as specific as a warrant pertaining to a particular property or location. *McAllister v. State* (1974), 159 Ind.App. 340, 306 N.E.2d 395. That is, a warrant must identify with specificity the person to be searched. *Baker v. State* (1983), Ind., 449 N.E.2d 1085. In the instant case, the warrant authorized search of "the person of Larry Cutter" and provided the address where Cutter resided. Cutter's claim that the warrant did not distinguish Cutter from the other two occupants of the house in which he resided is true only in the sense that the warrant did not provide Cutter's physical description. However, there is no authority for the proposition that such is necessary. While situations could arise in which a physical description might be necessary to identify the subject of a warrant, Cutter's is not such a case. Cutter's name and address adequately specified the person to be searched.

■ Cutter contends that the warrant was deficient because it did not allege the offense that had occurred. Although IC 35–33–5–2 requires that a probable cause affidavit must allege substantially the offense which occurred, IC 35–33–5–3 imposes no such requirement upon the warrant itself, nor has Cutter cited a case which engrafts such a requirement. We decline the invitation to supplement the provisions of IC 35–33–5–3.

■ Cutter contends that the warrant does not describe the place to be searched or the property to be seized with sufficient specificity. With respect to the place to be searched, Cutter's argument is factually incorrect. The warrant specifically states the address of Cutter's residence. With regard to the items to be searched for, a warrant must specify the items which are to be the focus of a search and seizure. A warrant conferring upon the executing officer unbridled discretion regarding the items to be searched is invalid. *Thompson v. State* (1993), Ind.App., 613 N.E.2d 461. In the instant case, the warrant described with particularity certain items to be seized, and authorized that bodily samples be taken from Cutter. As to these items, there can be no argument that the warrant was not sufficiently specific.

■ However, while executing the search warrant, police officers seized certain items not mentioned in the warrant. Pursuant to the plain view exception, officers may seize an item not specified in a search warrant only if the following conditions are met: 1) The officers are conducting a search pursuant to a valid warrant; 2) discovery of the item in question is inadvertent; and 3) the item immediately appeared to be related to the criminal activity in question. *Hopkins v. State* (1991), Ind., 582 N.E.2d 345.

■ As will be discussed below, the search warrant was valid. The items seized by police that were not mentioned in the search warrant included an empty Hamms beer bottle, a pair of men's tennis shoes, and a grocery sack from Ebby's Grocery Store in Muncie, Indiana. The proposed relevance of the empty beer container is not made clear in the record. However, Detective Crabbs testified at the probable cause hearing that men's footprints had been observed in the mud near where the body was discovered. No doubt the shoes were seized in order to determine whether they matched the footprints at the scene. Detective Crabbs also noted that the sack came from a grocery store located in Muncie, which was near where the body was found. In view of the fact that Cutter lived in Indianapolis, the sack was significant as possible evidence that Cutter had recently been present in Muncie. Nothing of record indicates, nor does Cutter contend, that police officers could or should have anticipated the presence of these items

in the areas specified in the search warrant. Therefore, the elements set out in *Hopkins* are satisfied and the warrant was not invalid for lack of specificity.

Cutter contends that the search warrant did not authorize seizure of Cutter to remove bodily samples. The search warrant authorized the search of "the person of Larry Cutter", and authorized seizure of "[h]ead hair, pubic hair, saliva, blood and fingernail specimens, of Larry Cutter." *Record* at 43. In obtaining bodily samples from Cutter, police transported Cutter to a hospital. Cutter maintains that this amounted to a seizure of his person, which the warrant did not authorize.

■ Cutter is correct in asserting that the taking of bodily samples constitutes a search and seizure. *See, e.g., Schmerber v. California* (1966), 384 U.S. 757, 767, 86 S.Ct. 1826, 1833, 16 L.Ed.2d 908 ("[s]uch testing procedures plainly constitute search of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of [the Fourth Amendment"). Accordingly, the taking of bodily samples is an intrusion which is limited by the constitutional protections afforded by Article I, Section II of the Indiana Constitution and the Fourth and Fourteenth Amendments of the United States Constitution. *DeVaney v. State* (1972), 259 Ind. 483, 288 N.E.2d 732. Cutter claims that a search warrant alone is insufficient to obtain bodily samples consistent with the relevant constitutional safeguards. Cutter argues that the search warrant must be accompanied by an arrest warrant because the subject of the warrant is necessarily "arrested" in order to secure the samples.

■ Neither party offers authority on the question of whether a person may be seized for the purpose of obtaining bodily samples upon the strength of a search warrant alone. Our research likewise does not reveal prior discussion of this question by Indiana courts. However, other jurisdictions have considered this or substantially similar questions. The defendant in *State v. Kutz* (1993), 87 Ohio App.3d 329, 622 N.E.2d 362, *dismissal, sua sponte, no substantial question and jurisdictional motion overruled*, 67 Ohio St.3d 1463, 619 N.E.2d 698, was involved in a traffic accident resulting in the death of another. When police arrived on the scene, they detected signs that the defendant driver may have been under the influence of alcohol. The defendant refused to voluntarily allow a sample of his blood to be drawn. Shortly thereafter, police officers obtained a search warrant authorizing the taking of a blood sample. Conceding that the blood sample was taken pursuant to a valid search warrant, the defendant nevertheless moved to suppress the results of the test on the ground that *Schmerber* requires that a blood sample may only be obtained after a person has been placed under arrest.

The *Schmerber* defendant, while under arrest, was searched without a warrant. The *Schmerber* court ultimately held that the warrantless search was proper because it was incident to an arrest. The *Kutz* court noted, however, that

"[i]f a search warrant had been obtained, the *Schmerber* court would have had no need to establish that the search was incident to arrest. Where a valid search warrant is obtained, prior to obtaining a blood sample from a driver, it is irrelevant whether or not such driver is under arrest." *Kutz, supra,* 622 N.E.2d at 365.

Implicit in this statement is the principle that a valid search warrant authorizing the taking of bodily samples also authorizes such detention of the subject of the warrant as is necessary to obtain the samples. We find the *Kutz* analysis persuasive and conclude, consistent with the *Kutz* court, that

"In the present case, a valid search warrant was obtained prior to obtaining the [bodily] sample[s] from [Cutter]. Because police had a valid search warrant, whether [Cutter] was under arrest at the time the [bodily] sample[s] [were] obtained is of no consequence." *Kutz, supra,* 622 N.E.2d at 365.

Cutter next contends that the warrant was defective because it did not comply with Ind. Code 35–33–5–8, which sets out the procedure for establishing probable cause orally or by telephone. Specifically, Cutter notes that: 1) the conversation was taped by Reed and not Judge Barnet; 2) Reed was not sworn;

3) Officer Crabbs and Reed did not sign the transcript of the telephone proceeding; and 4) Judge Barnet did not comply with the certification procedures.

 ██ It is apparent that the purpose of the requirement that "the judge shall record the conversation on audio tape" is to insure both that a reliable audiotape of the proceeding is made and that the issuing magistrate is responsible for insuring that such occurs. Although Judge Barnet did not tape the conversation himself, Reed informed Judge Barnet at the outset that the proceeding was being recorded. Thus, the purposes of the taping requirement were accomplished. We decline Cutter's invitation to elevate form over substance and we conclude that the taping of the telephonic probable cause hearing was in substantial compliance with IC 35–33–5–8, notwithstanding that the taping was performed by the prosecutor and not the judge.

 Cutter contends that the warrant was defective because Reed was not sworn. Cutter is correct in asserting that Reed was not sworn. However, a review of the transcript of the telephone call reveals that Reed did not provide testimony. Reed knew the substance of Crabbs's proposed testimony before the telephonic hearing was conducted because he had just finished discussing with Crabbs the results of the investigation. However, Reed could not and did not verify whether the information Crabbs proposed to give was true and accurate. It therefore cannot be said that Reed "provided testimony" upon which the search warrant was issued. He simply asked questions of Detective Crabbs in a manner calculated to elicit from Crabbs the information necessary to obtain a warrant. Because Reed did not provide testimony upon which Judge Barnet authorized issuance of the warrant, there was no requirement that he be sworn.

 With regard to Cutter's final two contentions, i.e., the signature and certification requirements, the issue presented is whether failure to affix the proper signatures at or near the time of the issuance of the warrant is fatal. IC 35–33–5–8 does not specify a deadline for compliance with its signature and certification requirements. Cutter nevertheless urges that a ten-day deadline be imposed upon the rational that IC 35–33–5–8 should be read in conjunction with IC 35–33–5–7(b)(1), which requires that search warrants be executed within ten days of issuance. Cutter offers no reason that IC 35–33–5–7(b)(1) is applicable in this situation, nor do we discern one.

As Cutter points out, the intent of the telephonic warrant provision is to encourage the procurement of warrants in situations involving exigent circumstances when a warrant otherwise may not be sought. We agree with Cutter that it was not the legislature's intent that in such proceedings the standard of probable cause for obtaining warrants be relaxed. To that end, the procedures set out in IC 35–33–5–8 are intended to insure that the party supplying information upon which a warrant is to be issued attests to a belief in the accuracy of his representations, and that the presiding magistrate also attests, in the form of judicial certification, to the fact that proper procedures were observed.

It would be preferable that the certification and attestation requirements in question be completed in as short a time as possible following the issuance of the warrant. However, failure to complete the necessary steps within a relatively short time does not necessarily compromise the purpose of such procedures. Such is true in the instant case. After discovering the oversight, Judge Barnet, Reed, and Crabbs listened to the audiotape while viewing transcripts of the tape to insure that the tape was authentic and the transcript accurate. Having determined that the tape and transcripts were authentic and accurate, Reed and Crabbs signed the transcript, all of which was then certified by Judge Barnet and entered into the record by what Cutter characterizes as a *nunc pro tunc* order.

Cutter raises legitimate objections to the use of a *nunc pro tunc* entry in such circumstances. A *nunc pro tunc* order may only reflect that which was actually previously done. *Schiro v. State* (1983), Ind., 451 N.E.2d 1047, *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699. It cannot be

argued that the signatures or certification existed prior to February 14, 1994. They did not. Therefore, a *nunc pro tunc* order to the effect that the signatures and certification occurred in December of 1992 would be invalid. However, we disagree that the attestation and certification were accomplished by means of a *nunc pro tunc* entry.

In view of the lack of a time requirement in IC 35–33–5–8, and on the facts of this case, the certification and attestations, though admittedly affixed later than may be preferable, were nevertheless sufficient to accomplish that which IC 35–33–5–8 was intended to insure; i.e., that the relevant persons and officials present attest to the accuracy of their representations and to the presence of probable cause, and further attest to the accuracy of the record of the proceedings. Therefore, the amended transcript reflecting proper signatures and certification was timely when made a part of the record on May 24, 1994, and there was no need to "backdate" by *nunc pro tunc* entry in order to be in compliance with relevant statutory provisions.

### II.

 Cutter contends the search warrant was not supported by probable cause. Probable cause to issue a search warrant need only show that there is a probability of criminal activity. *Beverly v. State* (1989), Ind., 543 N.E.2d 1111. The circumstances alleged during the telephonic conference, need only have led a person of reasonable caution to believe that a crime has been committed. *Chambers v. State* (1989), Ind., 540 N.E.2d 600. Due deference is accorded to a magistrate's determination that probable cause exists when reasonable minds would differ. *Id.*

 Detective Crabbs testified that he had observed the body of a female found along a remote river bank. The body had been dragged to the spot where it was found, and the clothing had been partially removed. Tire tracks in the area suggested that a car had been present and had gotten stuck in the mud. Crabbs confirmed the deceased's identity after conferring with IPD officers who had been investigating the deceased person's disappearance. The IPD officers told Crabbs that they had spoken with eyewitnesses who informed them that the victim was last seen alive leaving an Indianapolis tavern with the defendant in his car. Crabbs had viewed Cutter's car and observed that it was muddy. Crabbs had spoken with the owner of the property upon which the body was discovered, who reported that he had observed a car generally matching the description of Cutter's car get stuck in the mud near where the body was found. The property owner had seen the car after the victim disappeared but before the body was discovered. The above sufficiently establishes facts from which a person of reasonable caution would conclude that a murder had been committed, and support a reasonable belief that Cutter was involved. *Chambers, supra.*

Cutter nevertheless argues that Crabbs's testimony was insufficient because it was based in part upon hearsay testimony obtained from others, i.e., Jarrett and the eyewitnesses at the tavern, and that Crabbs did not present sufficient information to permit Judge Barnet to reach an independent finding that those witnesses were credible.

 According to IC 35–33–5–2(b), when based on hearsay, a probable cause affidavit must establish the credibility of the informant and contain information establishing that the totality of the circumstances corroborates the hearsay. Credibility is established, for purposes of determining probable cause, if the informant was a cooperative citizen aiding in the investigation of an ongoing criminal investigation of conduct that they witnessed. *Graham v. State* (1985), Ind.App., 480 N.E.2d 981, *cert. denied* (1986), 479 U.S. 1007, 107 S.Ct. 646, 93 L.Ed.2d 702. A statement based upon the testimony of officers engaged in an investigation and based upon their actual knowledge is not deficient despite its hearsay character. *Mitchell v. State* (1989), Ind., 541 N.E.2d 265. Thus, the information supplied by Crabbs which came from Jarrett is not incompetent.

 Where participating officers seeking a search warrant collectively have probable cause, their individual knowledge can be imputed to the officer seeking the warrant.

*Taylor v. State* (1993), Ind.App., 615 N.E.2d 907. The IPD officers interviewed the tavern witnesses in the course of their missing person investigation and reported the resulting information to Crabbs. Therefore, the information supplied to Crabbs by the IPD officers, which was in turn supplied by the tavern patrons, is not incompetent. *Id.; see also Minneman v. State* (1984), Ind., 466 N.E.2d 438, *cert. denied* (1985), 470 U.S. 1030, 105 S.Ct. 1402, 84 L.Ed.2d 789. Moreover, the information Crabbs supplied based upon his own personal observation corroborated the testimony of the others. *Seltzer v. State* (1986), Ind., 489 N.E.2d 939. The hearsay evidence of which Cutter complains was sufficiently reliable.

Cutter contends that the State failed to establish probable cause because it did not adequately establish the relevant time frame that the events in question occurred. Cutter notes that Crabbs did not testify as to when Berry was last seen leaving the tavern with Cutter and argues that, in the absence of such, the State has not established a nexus between Berry leaving the tavern with Cutter and Berry's death.

■■ The decision to issue a search warrant may be based not only upon the facts stated by the affiant, but also the reasonable and rational inference which may be drawn therefrom. *Utley v. State* (1992), Ind., 589 N.E.2d 232, *cert. denied* (1993), — U.S. ——, 113 S.Ct. 991, 122 L.Ed.2d 142. Crabbs testified that the body had been found on December 4, 1992. He testified that Jarrett had reported seeing a car generally matching the description of Cutter's car in his field the preceding Monday, November 30, and that Jarrett saw the car get stuck in the mud near where the body was discovered. Crabbs testified that he had observed Cutter's car on December 5 and the car was muddy on the outside. Finally, Crabbs testified that he had learned of Cutter's possible involvement from IPD detectives participating in a missing person investigation centered upon Berry. He reported that the IPD detectives had concluded that the last persons to see Berry alive were tavern patrons, who reported that Berry left the tavern with Cutter.

It is true that Detective Crabbs did not testify as to what date Berry was seen leaving the tavern with Cutter. However, in view of the date Jarrett reported seeing the car get stuck in the mud on his property, the date that the body was discovered, and the muddy condition of Cutter's car when observed by Crabbs earlier that day, Judge Barnet reasonably and rationally inferred that the date on which Berry and Cutter were seen leaving the tavern was sufficiently recent to establish the probability of a nexus between Cutter and Berry's death. *See Beverly, supra.*

We conclude that the totality of Crabbs's testimony contained sufficient facts which, when combined with the reasonable inferences to be drawn from those facts, adequately established the approximate dates of the events in question.

## III.

■■ Finally, even assuming *arguendo* that the warrant was defective, the search was valid because the officers who executed it acted in good faith reliance upon the warrant.

■■■ Information obtained pursuant to an invalid search warrant is admissible if the officers executing the warrant acted in good faith. Ind.Code 35–37–4–5. Evidence is obtained in good faith if it is obtained pursuant to:

"(1) A search warrant that was properly issued upon a determination of probable cause by a neutral and detached magistrate, that is free from obvious defects other than nondeliberate errors made in its preparation; and that was reasonably believed by the law enforcement officer to be valid ...: and

(2) The law enforcement officer, at the time he obtains the evidence, has satisfied applicable minimum basic training requirements established by rules adopted by the law enforcement training board." IC 35–37–4–5.

The good faith exception does not apply if: 1) the warrant was based upon false information knowingly or recklessly supplied by an affiant; 2) the warrant is facially deficient; or 3) the affidavit upon which the warrant was based is lacking in indicia of probable

cause. Additionally, the good faith exception does not apply to a judge or magistrate who has abandoned his judicial role or is not detached and neutral. *U.S. v. Leon* (1984), 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677.

Cutter's argument that Judge Barnet demonstrated lack of neutrality is totally unsupported by the record and is summarily rejected.

As discussed previously, the warrant is not facially deficient because it describes with specificity the places and people to be searched and the property to be seized.

██ Cutter contends that Crabbs knowingly or recklessly supplied false information in the probable cause hearing. To prevail upon this claim, Cutter must demonstrate not only that Crabbs offered testimony with reckless regard for its truth, but also that the misrepresentation was such that, had the magistrate known of the misrepresentation, it would have affected his determination of probable cause. *Franks v. Delaware* (1978), 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667.

Although Cutter offers several alleged inaccuracies and omissions in Crabbs's testimony, the inaccuracies as alleged were relatively minor in character and would not have affected Judge Barnet's determination. Moreover, even assuming that Crabbs's testimony in those instances could be characterized as inaccurate, Cutter has not demonstrated that Crabbs intentionally or recklessly misrepresented the truth. At most, the testimony to which Cutter refers may be described as minor mistakes and inaccuracies of fact. Such will not vitiate the reliability of an affidavit if innocently made and if not of a character that would have affected the magistrate's determination. *Utley, supra.*

Accordingly, even if the search warrant was invalid, the officers executing the warrant did so in good faith and the evidence obtained thereto is admissible.

The trial court did not err in denying the motion to suppress.

KIRSCH and BAKER, JJ., concur.