Samuel PATTERSON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 46A03–0003–CR–109.

Court of Appeals of Indiana.

Dec. 18, 2000.

Donald W. Pagos, Michigan City, Indiana, Attorney for Appellant.

Karen M. Freeman–Wilson, Attorney General of Indiana, Rosemary L. Borek, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

DARDEN, Judge

### STATEMENT OF THE CASE

Samuel Patterson ("Patterson") appeals his convictions by jury for rape and burglary as Class B felonies.

We affirm.*

### ISSUES

1. Whether the trial court erred in denying Patterson's motion to suppress.
2. Whether the trial court erred in admitting testimony about match probabilities derived from deoxyribonucleic acid ("DNA") tests.
3. Whether the trial court erred when it allowed the jury to take certain exhibits into the jury room during deliberations.
4. Whether the jury conducted an improper experiment during deliberations.

### FACTS

In the early morning hours of December 6, 1997, eighty-two year old Julia Maciejewski ("Maciejewski") called the police after being awakened by the sound of breaking glass. When police arrived at her home in Michigan City, they found Patterson at the rear of the house. After a short chase, he was arrested and charged with attempted burglary as a class B felony. During the investigation, blood was discovered on the curtains around the broken window. Police obtained a search warrant for a blood sample to be taken from Patterson for DNA analysis. On December 25, 1997, Patterson's blood sample was submitted to the Indiana State Police Laboratory, North Division. The results of the DNA analysis established that the

---

* This court heard oral argument on the issues raised in this appeal on November 29, 2000, and we want to express our appreciation to counsel for their presentations.

blood on the curtains inside Maciejewski's home was consistent with Patterson's DNA. Judgment of conviction for attempted burglary as a class B felony was entered on October 27, 1999 and Patterson appealed to this court. On June 14, 2000, this court reversed his conviction for reasons unrelated to the DNA analysis, and remanded with instructions to enter conviction for residential entry. *Patterson v. State*, 729 N.E.2d 1035 (Ind.Ct.App.2000).

The events giving rise to the instant case also occurred in Michigan City earlier in 1997. On October 25, 1997, seventy-nine year old Francis Kirkland ("Kirkland") fell asleep while watching television in her living room. She was awakened by the sound of breaking glass. When Kirkland got up to investigate, she was grabbed from behind and forced to the floor. Her robe was thrown over her head, and her pajama bottoms and undergarments were forcibly removed. Kirkland was then subjected to vaginal and anal intercourse. Her assailant then tied Kirkland's arms together with her pajama bottoms, stole approximately $500 from her bedroom, and exited through the front door.

Kirkland untied herself and called police. When investigators arrived, they discovered bloodstains on the kitchen counter and body fluids on the carpet and Kirkland's clothing. Photographs and a plaster cast were also taken of footprints discovered inside and around the outside of the home. Cotton swabs of the bloodstains and samples from the carpet and clothing were submitted to the Indiana State Police Laboratory, North Division, on November 18, 1997. Using the blood sample that had been obtained from the Maciejewski burglary, new DNA tests were performed. The results showed that the DNA profiles of blood and body fluids found at the Kirkland home were consistent with the DNA in Patterson's blood sample.

On August 16, 1998, the blood and body fluid samples from the Kirkland home were submitted to Cellmark Diagnostics ("Cellmark") in Germantown, Maryland for additional review. Their DNA analysis confirmed the State Police results. On October 21, 1998, Patterson was charged with one count each of rape, criminal deviate conduct, and burglary as class B felonies, and one count of robbery as a class C felony. A jury trial was held from October 25–27, 1998. At the conclusion of the trial, the jury was allowed to take the evidence into the jury room while they deliberated. Subsequently, the jury convicted Patterson on rape and burglary as class B felonies and judgment was entered on November 23, 1999.

On December 17, 1999, Patterson filed a Motion to Correct Error alleging improper jury experimentation during deliberation. Attached was a juror's signed affidavit. Patterson's motion was denied on January 27, 2000.

## DECISION

### 1. Motion to Suppress

At trial, the State sought to admit Patterson's blood sample from the Maciejewski burglary into evidence. Patterson moved to suppress, arguing that the police had no probable cause and needed a second search warrant in order to conduct the second series of DNA tests. He argued that while there was one seizure of his blood, there were two separate searches; and the second tests were performed without a valid warrant. In denying Patterson's motion to suppress, the trial court rhetorically commented that if Patterson's argument were followed to its logical conclusion, police would need to get a warrant whenever they wanted to perform fingerprint comparisons. Patterson disagreed, arguing that fingerprint files already exist in a separate database, but the trial court denied Patterson's motion.

On appeal, Patterson argues that the trial court erred when it denied his motion to suppress his blood and the DNA test results. Specifically, he argues that the second series of DNA tests were warrant-

less searches prohibited by the Fourth Amendment of the United States Constitution.[1]

■ When we review the denial of a motion to suppress evidence,

> [w]e review the record for substantial evidence of probative value to support the trial court's ruling. We do not reweigh the evidence. We resolve conflicting evidence in favor of the trial court and consider any substantial uncontroverted evidence. If the basis for the ruling on a motion to suppress is unclear, we will uphold the trial court if a reasonable view of the evidence supports the trial court's decision. The credibility of witnesses is for the trial court to determine.

*Moore v. State*, 723 N.E.2d 442, 448 (Ind. Ct.App.2000) (quoting *Willsey v. State*, 698 N.E.2d 784, 789 (Ind.1998) (citations omitted)).

■ We first consider whether the analysis of DNA is a search within the meaning of the Fourth Amendment. The Fourth Amendment, applicable to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV; *Shepherd v. State*, 690 N.E.2d 318 (Ind.Ct. App.1997). The Supreme Court has held that the analyses of biological samples are searches within the meaning of the Fourth Amendment. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989); *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995).

In *Schmerber*, the defendant was in a hospital receiving treatment for injuries sustained in an automobile accident. Believing that Schmerber was driving under the influence of alcohol, the police directed a physician to withdraw a blood sample for chemical analysis. Schmerber did not consent to the procedure. The subsequent analysis revealed that he was intoxicated. After Schmerber's conviction, he argued on appeal that the withdrawal of his blood was a violation of his Fourth Amendment right to be free from unreasonable searches and seizures.

The Court found that Schmerber's Fourth Amendment rights had not been violated because there were exigent circumstances created by the dissipation of the alcohol from his body. *Schmerber*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. Further, the testing procedures were reasonable and performed incident to Schmerber's lawful arrest. Although the Court held that the testing in this case was exempt from Fourth Amendment protections, it held that "testing procedures plainly constitute searches of 'persons,' and depend antecedently upon seizures of 'persons,' within the meaning of [the Fourth Amendment]." *Id.* at 1834.

In *Skinner*, the Federal Railroad Administration promulgated regulations requiring railroads to conduct blood and urine screens after train accidents involving death, injury, the release of hazardous material, or major damage to railroad property. Certain labor organizations brought suit seeking to enjoin the regulations. The labor organizations argued that the collection of blood and urine samples without particularized suspicion was unreasonable under the Fourth Amendment.

The Supreme Court held that the government had a compelling interest in regulating the conduct of railroad workers to ensure safety, and that the government's compelling interest outweighed the privacy interests of the workers. *Skinner*, 489

---

**1.** Patterson does not challenge the validity of the December 6, 1997 (Maciejewski case)

search warrant that authorized the taking of his blood.

U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639. However, the Court again made it clear "that the collection *and* subsequent analysis of the requisite biological samples must be deemed Fourth Amendment searches,...." *Id.* at 1413 (emphasis added). Additionally, *Von Raab* and *Vernonia* have recognized this holding.

Likewise, since *Skinner*, we have recognized that the taking of biological samples is a search under the Fourth Amendment. *Cutter v. State*, 646 N.E.2d 704 (Ind.Ct. App.1995); *King v. State*, 642 N.E.2d 1389 (Ind.Ct.App.1994). Most recently, we have also recognized the Court's holding that the testing of biological samples is a search under the Fourth Amendment. *Linke v. Northwestern School Corp.*, 734 N.E.2d 252 (Ind.Ct.App.2000) (state compelled collection and testing of urine constitutes Fourth Amendment search). Therefore, it is clear that DNA tests are searches under the Fourth Amendment.

■ We now turn to whether a warrant was required to conduct the second DNA tests using Patterson's blood sample. The Fourth Amendment protects "people from *unreasonable* government intrusions into those areas of an individual's life in which he has a legitimate *expectation of privacy.*" *State v. Overmyer*, 712 N.E.2d 506, 507 (Ind.Ct.App.1999) (emphasis added). To determine whether the government's action was unreasonable, we ask whether the action taken was an unlawful search and seizure under common law at the time the Fourth Amendment was enacted. *Wyoming v. Houghton*, 526 U.S. 295, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999); *State v. Friedel*, 714 N.E.2d 1231 (Ind.Ct.App. 1999). If "that inquiry yields no answer, we must evaluate the search and seizure under traditional standards of reasonableness by assessing, on the one hand, the degree to which it intrudes upon the individual's privacy and, on the promotion of legitimate governmental interests." *Wyoming*, 526 U.S. at 299–300, 119 S.Ct. 1297.

Because DNA testing was clearly not on the minds of the framers of the Federal Constitution, we utilize the traditional standards of reasonableness in addressing the subsequent testing of Patterson's DNA. Patterson argues that the tests intrude upon his privacy. However, the State, citing case law from New York and Georgia, argues that the tests did not intrude upon Patterson's privacy interest because the tests were as unintrusive as fingerprint examinations.

We first examine the degree to which the DNA tests performed intruded upon Patterson's privacy. The record reveals that the DNA tests conducted were the Restriction Fragment Length Polymorphism (RFLP) and the Polymerase Chain Reaction (PCR) tests. Both tests were conducted under laboratory conditions. The tests use electrophoresis[2] and chemical analysis to analyze the DNA in Patterson's blood sample. Lisa Grossweiler ("Grossweiler") of Cellmark testified that the portion of DNA extracted for testing was incapable of determining Patterson's physical traits such as "hair color, eye color," or whether he had "cystic fibrosis". (R. 292). After the tests were conducted, a statistical calculation using a random sample of approximately 200 DNA profiles is conducted to calculate the frequency one would expect to find his genetic characteristics in the population. Neither test involved the invasion of Patterson's body nor

---

**2.** Electrophoresis involves placing DNA samples in a hole at the top of a gelatinous film. An electric charge is applied to the gel and DNA fragments move toward the bottom of the film leaving behind a molecular strand. A chemical treatment is applied and a nylon membrane is placed onto the gel. When the strands bind to the nylon membrane, another chemical or "genetic probe" is applied. The genetic probe seeks out and binds with DNA fragments along the strand. The membrane is then washed, irradiated, and placed on x-ray film. When the film is exposed, a pattern or "DNA fingerprint" is left for comparison. Thomas J. Fleming, Annotation, *Admissibility of DNA Identification Evidence*, 84 A.L.R.4th 313 (1991).

the release of information unrelated to the performance of the RFLP and PCR tests.[3]

We now examine the government's interest in promoting the use of DNA tests in criminal investigations. In his brief, Patterson does not address any governmental interest in DNA testing. The State implies that the government has an interest in investigating criminal cases, and that Indiana has chosen to pursue that interest by establishing a DNA Databank of convicted felons.

■ "The State may exercise its police power to promote the health, safety, comfort, morals, and welfare of the public." *Price v. State*, 622 N.E.2d 954 (Ind.1993). To this end, states recognize that the use of DNA has become a powerful investigative tool that links suspects to crimes. NATIONAL RESEARCH COUNCIL, THE EVALUATION OF FORENSIC DNA EVIDENCE, (1996). There has also been an increasing recognition of the ability of DNA testing to exonerate the innocent. U.S. DEPARTMENT OF JUSTICE, CONVICTED BY JURIES, EXONERATED BY SCIENCE: CASE STUDIES IN THE USE OF DNA EVIDENCE TO ESTABLISH INNOCENCE AFTER TRIAL (1996). This recognition was evidenced by Congress' passage of the DNA Identification Act of 1994. This law provided funding for the Federal Bureau of Investigation's Combined DNA Indexing System ("CODIS"). This program "enables federal, state, and local laboratories to store and compare DNA profiles electronically and thereby link serial crimes to each other *and* identify suspects by matching DNA from crime scenes to convicted offenders." *DNA Analysis Backlog Elimination Act of 2000: Hearing on H.R. 2810, H.R. 3087, and H.R. 3375 Before the Subcommittee on Crime of the House Judiciary Committee*, 106th Cong. (2000) (statement of Dr. Dwight E. Adams, F .B.I.) (emphasis added).

On February 29, 1996, Indiana joined CODIS when our General Assembly established the Indiana DNA Database by enacting P.L. 100–1996, now codified at IND. CODE § 10–1–9. The statute requires individuals convicted of certain felonies, including burglary, to provide a DNA sample for testing and inclusion in a database so long as it does not pose an unreasonable risk to their health. IND.CODE § 10–1–9–10. The purpose of the testing is to analyze and type the genetic markers in the DNA sample, to assist law enforcement identification purposes, and for research and administrative purposes. IND.CODE § 10–1–9–13. Every other state has en-

---

3. We recognize the growing privacy concerns surrounding the use and access to information retrieved from an individual's DNA by government entities and third parties. The view that DNA analysis is no different than traditional fingerprinting systems is becoming less palatable. DNA analysis provides unprecedented access into an individual's future physical and psychological health, the health of close relatives, and insight into paternity issues. Michelle Hibbert, *DNA Databanks: Law Enforcement's Greatest Surveillance Tool?*, 34 WAKE FOREST L.REV. 767 (1999). This access has raised serious concerns about genetic discrimination, and steps have been taken to limit the use of this information in employment and insurance coverage decisions. *See* Genetic Information Nondiscrimination in Health Insurance Act of 1999, H.R. 306, 106th Cong. (1999). There is also concern about how civil litigants might use DNA test results. A party could conceivably use IND. TRIAL RULE 35 to obtain a blood sample from the opposing party. If a subsequent DNA analysis reveals a predisposition to developing certain genetic disorders, these results might be used to prove or disprove the causation element in a negligence action involving exposure to a toxic substance, or be used in a medical malpractice action against a doctor's alleged failure to inform parents of the risks of having children with genetic defects. Roberta M. Berry, *Genetic Enhancement in the Twenty First Century: Three Problems in Legal Imagining*, 34 WAKE FOREST L.REV. 715 (1999). These are all issues that policy makers, legislators, and courts will have to wrestle with. At a minimum, it is clear that the results of DNA analysis provide extremely personal information about an individual. The acquisition or use of information obtained from DNA analysis by the government is certainly an intrusion into an individual's privacy under the Fourth Amendment, but the facts of this case show that the second DNA tests performed on Patterson's blood were not unreasonable searches.

acted similar legislation. H.R. REP. NO. 106–900, pt. 1, at 27 (2000).

■ As a result, we find that Indiana has a substantial interest under the Fourth Amendment in promoting the use of DNA testing, not only in creating a database, but also in conducting criminal investigations and exonerating the innocent. Although the State intruded upon Patterson's privacy by analyzing his blood for DNA evidence, his privacy was outweighed by State's interest in protecting the citizens of Indiana by promoting DNA analysis in criminal investigations. Under the facts of this case, the subsequent testing of Patterson's DNA was reasonable under the Fourth Amendment.[4]

■ We now are left to consider whether Patterson has a reasonable expectation of privacy in a blood sample lawfully obtained but being used in an unrelated criminal investigation. To determine whether a person has a reasonable expectation of privacy, we employ a two-part test: (1) "we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy;" and (2) "we inquire whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Bond v. U.S.*, 529 U.S. 334, 120 S.Ct. 1462, 1465, 146 L.Ed.2d 365 (2000) (quoting *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979)).

■ There is no evidence in the record showing that Patterson exhibited an actual expectation of privacy in the blood sample taken by police on December 6, 1997. Likewise, we find that based upon the specific facts of this case society is not prepared to recognize as reasonable Patterson's continued expectation of privacy in blood samples *lawfully* collected by police. Further, when Patterson was convicted of the December 6, 1997 attempted burglary, he became a convicted felon required to provide a DNA sample for inclusion in Indiana's DNA Database. IND. CODE § 10–1–9–10. The tests performed in this case (Kirkland) were submitted to Indiana State Police and Cellmark on November 18, 1997 and August 16, 1998, respectively. Because Patterson had been lawfully required to provide a DNA sample for the Database at the time of the State Police and Cellmark tests,[5] he cannot now claim he had a reasonable expectation of privacy in his DNA. *See State v. Machlah*, 505 N.E.2d 873, 879 (Ind.Ct.App.1987) ("a reasonable expectation of privacy means an expectation at the time of the search, not after police have completed the search.") Because Patterson did not have a reasonable expectation of privacy in his blood sample, the reuse of his validly obtained DNA sample in a subsequent unrelated criminal investigation did not trigger Fourth Amendment protections. *Smith v. State*, 734 N.E.2d 706 (Ind.Ct.App.2000). Therefore, there was ample evidence of probative value to support the trial court's denial of Patterson's motion to suppress.[6]

4. We do not address whether the testing of Patterson's DNA would pass constitutional muster under Article I, § 11 of the Indiana Constitution. During oral argument, Patterson briefly mentioned that his privacy interests were protected under our state constitution. However, he waives any consideration of that argument because he failed to object on that basis at trial and provide a separate legal analysis addressing state constitutional search and seizure jurisprudence. *State v. Friedel*, 714 N.E.2d 1231 (Ind.Ct.App.1999).

5. We did not reduce Patterson's conviction to residential entry, a non-DNA Database conviction, until June 14, 2000. *Patterson*, 729 N.E.2d 1035.

6. We are unable to determine from the record whether Patterson became a suspect in the Kirkland case before his DNA from the Maciejewski case was compared with the DNA taken from Kirkland's home. While the facts in this case support affirming the trial court's denial of Patterson's motion to suppress, we would encourage law enforcement officers to obtain warrants before conducting DNA tests on a suspect's bodily fluids. As we have noted earlier in this opinion, DNA testing is a search under the Fourth Amendment. "Under the Fourth Amendment, a warrantless search can only be justified by probable cause and one of the few, well-delineated exceptions to the warrant requirements, and the State carries the burden of proving that the action

## 2. *Expert Testimony*

■ At trial, the State called Lisa Black ("Black") of the Indiana State Police Laboratory and Grossweiler of Cellmark to testify about the DNA tests that were performed. When asked what their findings were, Patterson's counsel objected, arguing that the scientific principles behind the calculation of match probabilities were unreliable. The trial court overruled his objection, and the expert witnesses were allowed to testify.

Black testified that the DNA profile obtained from the evidence was consistent with the DNA profile in the sample obtained from Patterson, an Afro–American. She also testified that the frequency with which the DNA profile from the evidence would occur in the Caucasian population was 1 in 2,600,000,000 and 1 in 55,000,000 in the Afro–American population. Grossweiler testified that the match probabilities were 1 in 17,000,000,000 in the Caucasian population, 1 in 7,000,000,000 in the Afro–American population, and 1 in 8,100,-000,000 in the Western Hispanic population.

On appeal, Patterson argues that the trial court erred in admitting evidence of match probabilities. Specifically, Patterson argues that the science behind match probabilities is unreliable, and that he was prejudiced because the jury was allowed to hear numbers of this magnitude from experts who were not trained in the techniques of population statistics. The State argued that the trial court did not abuse its discretion by admitting this evidence. Specifically, the State argued that the experts testified about how their statistical analyses were approved by experts in population statistics and that their methods were generally accepted within the scientific community.

■ We review a trial court's admission of scientific evidence and the determi-

nation of its reliability for an abuse of discretion. *Ingram v. State*, 699 N.E.2d 261 (Ind.1998); *Patterson*, 729 N.E.2d 1035. Indiana Rule of Evidence 702(b) provides that "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Our supreme court has held that DNA evidence is not admissible per se, but that the trial court must employ the following three-part test to determine admissibility: "(1) [that] the scientific principles upon which the expert testimony rests are reliable; (2) the witness is qualified; and (3) the testimony's probative value is not substantially outweighed by the dangers of unfair prejudice." *Id.* at 262.

We recognize that the topic of match probabilities has been controversial. This was particularly true in 1992, when the National Research Council ("NRC") issued a report recommending the use of the "ceiling-principle." NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE, 1992. The "ceiling-principle" is a statistical method of reducing the risk of error when calculating match probabilities across ethnic groups. *Id.* It was recommended because "not enough was known about DNA sequences to make an accurate calculation of the frequency with which particular sequences appear in various ethnic groups." Karyn Hede George, *DNA Fingerprinting Gets a Reprieve*, TECHNOLOGY REVIEW Nov/Dec.1996, at 15–16. However, in 1996, the NRC issued a second report that quieted the debate. Eliot Marshall, *Academy's About Face on Forensic DNA*, SCIENCE, May 10, 1996, at 803. The NRC concluded that the "technology for DNA profiling and the methods for estimating frequencies and related statistics have progressed to the point where the reliability and validity of properly collected and analyzed DNA data should not be in doubt." NATIONAL RESEARCH COUNCIL, *su-*

fell within one of the exceptions. Although an exception may justify proceeding without a warrant, it does not eliminate the need for

probable cause." *Hanna v. State*, 726 N.E.2d 384, 388 (Ind.Ct.App.2000).

*pra.* In that report, the NRC issued recommendations regarding the estimation of random match probabilities. Recommendation 4.1 is particularly relevant to this case. It states, "[I]f the race of the person who left the evidence-sample DNA is known, the database for the person's race should be used; if the race is not known, calculations for all the racial groups to which possible suspects belong should be made." *Id.* Therefore, because the calculation of match probabilities is now based on empirical scientific research, and not unsubstantiated estimates, its presentation and admission into evidence need not constitute error. *Patterson,* 729 N.E.2d 1035.

In this case, we find that the trial court did not err by admitting the experts' testimony about match probabilities. Both Black and Grossweiler testified that the principles upon which the statistical calculations were made are reliable. Black testified that random DNA samples were collected from blood banks in the Midwest, and that they were separated into groups of 200 Caucasian and 200 Afro–American samples. A statistical projection then estimated the frequency with which the different DNA characteristics would occur in the general population. Grossweiler also testified that Cellmark's samples were collected randomly, and they were placed into groups of approximately 100 to 200 samples representing Caucasians, Afro–Americans, and Western Hispanics. Both experts testified that their respective laboratories hired population geneticists to validate the methodology used and the randomness of their samples. Black testified that the procedures used by the Indiana State Police are used throughout Indiana and are similar to those used by the F.B.I. and other labs around the country. The record also shows that Patterson's race was not known at the time of the tests, and that the match probabilities were calculated across multiple racial groups.

Concerning Black and Grossweiler's qualifications, Patterson did not object, and we find that Black's and Grossweiler's knowledge, training, education, and experience qualified each as an expert in the field of DNA analysis. *See Patterson,* 729 N.E.2d 1035. Black testified that she has a Bachelor's degree in biochemistry and has been employed with the Indiana State Police laboratory since 1985. Black has been assigned to the DNA Unit since 1995 and has completed DNA analysis training. She has also received additional training from the F.B.I. and Promega Corporation. Black testified that she has given her opinion as a DNA analyst in court on approximately 92 occasions, and has performed thousands of tests on various DNA samples. Black is also a member of the Midwest Association of Forensic Scientists and is a provisional member of the American Academy of Forensic Sciences. She also stated that the Association of Crime Laboratory Directors accredits the State Police Laboratory.

Grossweiler testified that she also has a Bachelor's degree in biochemistry, and that she has been employed with Cellmark since 1987. She has begun work on her Master's degree in forensic sciences and stated that she has given her opinion as a DNA analyst in court on approximately 36 occasions. Grossweiler stated that she also receives routine training in DNA analysis and has performed over 400 RFLP and PCR tests. She also testified that the American Association of Blood Banks and the American Society of Crime Laboratory Directors accredit Cellmark.[7]

We also find that the probative value of the expert testimony outweighed the danger of unfair prejudice to Patterson. As noted above, the technology involved in DNA analysis has advanced beyond the point where the reliability of match probabilities is called into question. It is based on empirical scientific research and not on

---

**7.** It is unclear whether this is the same organization that accredits the Indiana State Police Laboratory.

unsubstantiated estimates. The fact that the probabilities are extremely high demonstrates the strength of DNA analysis and does not prejudice Patterson. Therefore, the trial court did not abuse its discretion in admitting expert testimony concerning match probabilities.

### 3. *Exhibits in the Jury Room*

■ During the trial, the State admitted a pair of tennis shoes, photographs of shoe prints, and a plaster cast of a shoe impression into evidence. Detective Larry Biggs ("Detective Biggs") collected the evidence. When asked whether the soles of the shoe were consistent with the impressions at the scene, Detective Biggs responded, "Yes they are." (R. 203). Patterson's counsel objected and examined the detective to determine whether he was qualified to make that determination. The detective testified that he did not have any training in comparing shoe prints. When the State attempted to ask the detective whether he could make a reasonable opinion based on everyday knowledge, the trial court stated, "Then if that's the case, the jury is going to make that determination. The jury will disregard any opinion this witness had about the comparison about those shoes and the cast and the photographs." (R. 207).

At the close of evidence, the trial court allowed the exhibits to go with the jury into the jury room. After judgment of conviction was entered, Patterson filed the sworn affidavit of Clinton Powell ("Powell"), a juror. In the affidavit, Powell states that some of the jurors attempted to match the pattern on the sole of the shoes to the pattern in the photograph by laying the shoes on the photograph. Powell states that the "measurements and the comparison results were considered by myself and my fellow jurors in rendering our verdict." (R. 86).

Patterson argues that the trial court erred by allowing the exhibits to go into the jury room. Specifically, he argues that because the detective was not qualified to

give his opinion, the submission of the exhibits could not aid the jury in its deliberations. Patterson also argues that the jury conducted improper experiments that allowed it to consider evidence not introduced at trial.

■ We note that the submission of materials to the jury room is governed by statute and case law. IND.CODE § 34–36–1–6; *Robinson v. State*, 699 N.E.2d 1146 (Ind.1998). However, our supreme court has held that the statute only applies to cases where the jury expresses an explicit disagreement concerning testimony at trial. *Id.* In this case, the trial court submitted the exhibits to the jury prior to deliberations, and there is no evidence of disagreement. Therefore, we apply case law.

■ We apply the following standard when determining whether materials can properly be submitted to the jury room.

(a) The court in its discretion may permit the jury, upon retiring for deliberation, to take to the jury room a copy of the charges against the defendant and exhibits and writings which have been received in evidence, except depositions.

(b) Among the considerations which are appropriate in the exercise of this discretion are:

(1) whether the material will aid the jury in a proper consideration of the case;

(2) whether any party will be unduly prejudiced by submission of the material; and

(3) whether the material may be subjected to improper use by the jury.

*Robinson*, at 1149–1150.

In this case, Patterson states that "all three of the consideration[s] warrantied [sic] against providing the jury with Patterson's shoes and the prints found at the scene of the crime." Patterson's Brief at 11. Patterson claims that the jury came to

the improper conclusion that the pattern on the soles of the shoes matched the photograph. His argument is based upon the fact that Detective Biggs could not conclude it was a match. Further, Patterson argues that the exhibits were subject to improper use by the jury because they could make comparisons.

 We find no error in the trial court's decision to send the exhibits to the jury room. It is well settled that it is within the jury's province to determine facts from the evidence, and judge the credibility of those facts. *Thornton v. State*, 712 N.E.2d 960 (Ind.1999). Because Patterson did not object to the admission of the shoes, photographs, or the plaster cast, the jury did nothing more than examine the evidence admitted at trial.

4. *Improper Jury Experiment*

 Finally, we consider whether there was improper experimentation by the jury when it measured and compared the shoes and shoeprint in evidence. "[A]n experiment by the jury is improper where it amounts to additional evidence supplementary to that introduced during the trial." *Bradford v. State*, 675 N.E.2d 296, 304 (Ind.1996). In *Bradford*, the defendant was convicted of arson and murder. During the trial, the jury was permitted to visit the scene of the crime. At trial, a detective gave testimony concerning experiments in which he timed how long it took him to walk to various spots and pour gasoline inside the house. During deliberations, the jury conducted experiments that involved walking through the motions of pouring gasoline and timing how long it took. After Bradford was convicted, several jurors signed an affidavit to this affect. On appeal, Bradford claimed this was in improper jury experiment, but we disagreed. We held that the jurors considered only the evidence admitted at trial, therefore, there was no error.

Likewise, the jurors in this case only considered the evidence admitted at trial. Biggs testified that he surveyed the prop-

erty and observed shoeprints on the inside and outside of the property. He testified that he took photographs, made a plaster cast of one of the impressions, and took custody of a pair of Patterson's shoes. All these items were admitted into evidence. The jury's measurement and comparison of the shoes with the photographs was not an improper experiment.

We affirm.

FRIEDLANDER, J., and KIRSCH, J., concur.