Rosa J. LINKE, Reena M. Linke (By their next friends and parents), Scott L. Linke and Noreen L. Linke, Appellants (Plaintiffs below),

v.

NORTHWESTERN SCHOOL CORP., Appellee (Defendant below).

No. 34S05–0103–CV–151.

Supreme Court of Indiana.

March 5, 2002.

Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, Attorney for Appellants.

Anthony S. Benton, Laura L. Bowker, Stuart & Branigin, Lafayette, IN, David R. Day, Johnson, Smith, Pence & Heath LLP, David J. Emmert, Indianapolis, IN, Attorneys for Amici Curiae.

Julia Blackwell Gelinas, John H. Daerr, Thomas E. Wheeler, II, Locke, Reynolds LLP, Indianapolis, IN, Attorneys for Appellee.

## ON PETITION TO TRANSFER

SULLIVAN, Justice.

Rosa and Reena Linke, students in the Northwestern School Corporation in Howard County, contend that the school's random drug testing program violates their rights under the Indiana Constitution to be free from unreasonable searches and seizures. After weighing the students' privacy interests and the character of the search against the nature and immediacy of the governmental concern at issue, we conclude that the drug-testing program here is constitutional.

*Background*

Northwestern School Corporation (NSC) is a public school system covering rural and suburban areas of Howard County near Kokomo. It operates two elementary schools, one middle school, and one high school.

In the mid–1990s, drug usage in middle and high schools became a concern to the administrators at NSC. In the spring of 1995, the Indiana Prevention and Resource Center released a survey regarding drug, alcohol, and tobacco usage by students in grades seven through ten at NSC schools. The survey showed higher than average use of gateway drugs among some students. Specifically, it found that NSC's eighth graders used amphetamines at a rate higher than state prevalence rates; ninth graders used drugs, alcohol, and cigarettes at higher than the state prevalence rates; and tenth graders reported a higher daily use of alcohol than state prevalence rates.

Drug abuse continued to be a problem at NSC high and middle schools. During the 1998–99 school year, there were two suspensions and two expulsions in the high school and five suspensions and five expulsions in the middle school because of student drug usage. Beginning in 1987, three Northwestern High School students (including a recent graduate) died in drug related incidents. The most recent death, in 1996, occurred after a student overdosed on morphine pills acquired from a fellow student while at school. These contraband pills passed through a chain of student hands before finding their final resting place.

The 1996 death caused serious concern. In response, a task force consisting of administrators, teachers, staff, and interested parents was formed to examine NSC's approach to drugs. In order better to fulfill NSC's zero tolerance policy towards drug abuse, the task force addressed three primary areas: anti-drug curriculum; incorporation of special anti-drug programs; and development of a student drug testing policy.

The task force created the Northwestern School Corporation Extra Curricular Activities and Student Driver Drug Testing Policy ("Policy") effective January 12, 1999. Its purpose is "(1) to provide for the health and safety of students; (2) to undermine the effects of peer pressure by providing a legitimate reason for students to refuse to use illegal drugs; and (3) to encourage students who use drugs to participate in drug treatment programs." The Policy is explicitly not a punitive enterprise. Under the Policy, testing positive for banned substances does not result in academic penalty, results of drug test are not documented in any student's academic records, and information regarding the results is not disclosed to criminal or juvenile authorities absent binding legal compulsion.

The Policy applies to all middle and high school students, grades 7–12, participating in school athletics, specified extra-curricular and co-curricular [1] activities, as well as to all student drivers who wish to park their vehicles on campus. The activities included by the Policy are athletics, academic teams, student government, musical performances, drama, Future Farmers of America, National Honor Society, and Students Against Drunk Driving. Students wishing to engage in one of these activities are required to sign a form consenting to the testing and must also obtain written consent from a parent or guardian.[2] Students participating in co-curricular activities who choose not to participate in the testing program are given an opportunity to prepare alternative assignments, for academic credit, in lieu of participating in public performances.

A computer-based system, designed specifically for the purpose of randomly selecting individuals for drug testing, is used to pick the students. Midwest Testing, a testing firm that notifies the school principals who will be tested, currently handles this process. Students are not given advance warning of the testing.

Upon selection, a student is escorted to a trailer that is driven to the school by Midwest Testing. Only one student is taken to the trailer at a time. The student is

---

1. Co-curricular activities are activities, participation or membership in which are an extension of and outside the normal school day and for which academic credit or grades are earned, such as band and choir.

2. Students may also be entered into the testing program at the request of their parent or guardian or with the permission of the parent or guardian when a student shows signs of drug use that provides reasonable suspicion to search a student.

given a specimen bottle and is allowed to enter the restroom facility in the trailer unattended. The facility has a commode containing blue dye and all water faucets are turned off so that water cannot be used to dilute a specimen. Once inside the restroom facility, the student is separated from the monitor by a closed door. After producing a specimen, the student leaves the restroom, hands the specimen to the Midwest Testing employee to be sealed, initials the sealed bag, and returns to class.

The specimens are sent to Witham Laboratories, an independent laboratory, where they are tested only for the substances banned by the Policy.[3] The testing laboratory does not know the identity of the students tested and NSC follows strict procedures regarding the chain of custody and access to test results. Negative test results are mailed to the designated authority. Positive specimens, on the other hand, are retested. If the re-test is positive, Witham communicates the specimen number of the positive result to a building administrator who alerts the student's school principal. The principal is then able to determine the identity of the student by reference to the specimen number. In such instances, the principal holds a conference with the student and his or her parents and at that time the student is given the opportunity to submit documentation that would justify a positive result, e.g., prescription medication. Failure to provide a satisfactory explanation for a positive test results in further action by the school.

Athletes testing positive are governed by an athletic code of conduct. Students participating in all other activities are gov-erned by a student activities code of conduct. Under both codes, a student may be barred from participating in an activity for up to 365 days. However, the consequences vary based upon the activity and substance.

A student is entitled to be re-tested, at the school's expense, when the drug for which the student tested positive would be expected to have disappeared from the student's body. A negative test at this time allows the student to return to full participation in the activity but a positive re-test is deemed to constitute reasonable suspicion, such that NSC reserves the right to re-test the student throughout the remainder of the school year. A positive re-test also bars the student from re-turning to the activity until such time as the student tests negative. Beyond the first re-test, the Policy does not require the school to pay for additional tests requested by the student.

Rosa and Reena Linke ("the Linkes") were both students at Northwestern High School, a part of NSC, when this lawsuit was filed. At the time of the suit, Rosa was a junior who participated in track, National Honor Society, Students Against Drunk Driving, the Prom Committee, and Academic Competition. She also had a driver's license and wanted to drive to school. Reena was a freshman participating in choir, track, Academic Competition, Sunshine Society, and Fellowship of Christian Athletes. Their claim was that the Policy violated the Search and Seizure Clause, art. I, § 11, and the Privileges and Immunities Clause, art. I, § 23, of the Indiana Constitution.

The trial court granted summary judgment in favor of NSC. The Court of Ap-

---

**3.** The Policy permits testing for alcohol, amphetamines, anabolic steroids, barbiturates, benzodiazepines, cocaine metabolites, LSD, marijuana metabolites, methadone, metha-qualone, nicotine, opiates, phencyclidine, and propoxyphene. Although the Policy allows for testing of "other specified drugs," no other drugs are tested for.

peals reversed, holding that, in regard to school children, the Search and Seizure Clause, art. I, § 11, of the Indiana Constitution implicitly contains "a general requirement of individualized suspicion," which was not met by the Policy. *See Linke v. Northwestern School Corp.*, 734 N.E.2d 252, 259 (Ind.App.2000). We granted transfer. *Linke vs. Northwestern School Corp.*, No. 34S05–0103–CV–151, 2001 Ind. LEXIS 229 (Mar. 5, 2001).

*Discussion*

I

The Search and Seizure Clause, art. I, § 11, of the Indiana Constitution ("Section 11") provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized." Although Section 11 is almost identical to the Fourth Amendment of the United States Constitution, this court's analysis of claims arising under Section 11 is separate and distinct from Fourth Amendment analysis. *See Moran v. State*, 644 N.E.2d 536, 538 (Ind.1994). However, in this regard federal law and the law of sister states may have persuasive force. *Id.*

A

■ The Linkes correctly contend that urinalysis drug testing constitutes a search under Section 11. "In the law of searches and seizures, the term 'search' implies prying into hidden places for that which is concealed." *Moran*, 644 N.E.2d at 540 (citing *Lindsey v. State*, 246 Ind. 431, 439, 204 N.E.2d 357, 362 (1965)). In finding that urinalysis testing constitutes a search under the Fourth Amendment, the United States Supreme Court has noted,

"chemical analysis of urine . . . . can reveal a host of private medical facts." *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). Similarly, Judge Friedlander has written that "the taking of bodily samples [for evaluation] constitutes a search." *Cutter v. State*, 646 N.E.2d 704, 711 (Ind.Ct.App.1995), *transfer denied; cf. DeVaney v. State*, 259 Ind. 483, 487, 288 N.E.2d 732, 735 (1972) (holding that the taking of a blood sample constituted a Section 11 search).

Given that NSC is a public school corporation and that its drug testing policy is a Section 11 search, it is necessary to determine whether the search violates Section 11.

B

■ In *Moran* and *Brown v. State*, 653 N.E.2d 77 (Ind.1995), we held that the measure of whether a government search violated Section 11 is whether the process is "reasonable." *Id.* at 80. Here, the Linkes and NSC advance differing views as to the appropriate measure of reasonableness. The Linkes argue that in order to be reasonable under Section 11, a school drug testing policy must be based on the element of individualized suspicion. Under this conception, random drug testing of students would violate Section 11 since, by definition, a random program is not based on individualized suspicion. On the other hand, NSC argues that the appropriate measure of reasonableness under Section 11 is substantially similar to the one expounded in *Vernonia School District 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), where the Supreme Court balanced the intrusion of the search on the individual's Fourth Amendment interests with its promotion of legiti-

mate governmental interests. *Id.* at 653–654, 115 S.Ct. 2386 (*quoting Skinner*, 489 U.S. at 619, 109 S.Ct. 1402, and *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Under this approach, NSC maintains, the Policy meets the reasonableness requirement of Section 11.

The Linkes point out that we have held "that a police officer may not stop a motorist in Indiana for a possible seat belt violation unless that officer reasonably suspects that the driver or a passenger in the vehicle is not wearing a seat belt as required by law." *Baldwin v. Reagan*, 715 N.E.2d 332, 337 (Ind.1999). From this proposition, they argue, and the Court of Appeals held, that for any search to meet Section 11 muster, it must be based on "individualized suspicion." *Linke*, 734 N.E.2d at 259.

We do not think the individualized suspicion requirement of *Baldwin v. Reagan* is so readily transferable to this case. *Baldwin v. Reagan*—and *Moran* and *Brown* before it—focused on the role of Section 11 in protecting those areas of life that Hoosiers regard as private "from unreasonable *police* activity." *See Moran*, 644 N.E.2d at 540 (emphasis added); *Brown*, 653 N.E.2d at 79 (noting that protection from unreasonable searches and seizures plays a uniquely important role in the context of criminal procedure). Preventing unreasonable *law enforcement activity* was a key factor motivating our holding in *Baldwin v. Reagan* that individualized suspicion of a seatbelt violation is required in order to stop a motorist for that purpose. 715 N.E.2d at 337.

A search conducted by a school corporation is substantively different than a search conducted to enforce the law. This is in no small part due to the different role played by law enforcers and teachers.

Law enforcement officers function as adversaries of criminal suspects. These officers have the responsibility to investigate criminal activity, to locate and arrest those who violate our laws, and to facilitate the charging and bringing of such persons to trial. Rarely does this type of adversarial relationship exist between school authorities and pupils. Instead, there is a commonality of interests between teachers and their pupils.

*New Jersey v. T.L.O.*, 469 U.S. 325, 349–350, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).

Under the Policy, test results are not volunteered to law enforcement, nor are they used for any internal disciplinary function. Absent such consequences, we do not believe the rationale for individualized suspicion is as strong here as in the seat belt enforcement context. *Cf. Oman v. State*, 737 N.E.2d 1131, 1146–47 (Ind. 2000) (holding that under the Fourth Amendment the results of an employee's administrative drug test can be used in a criminal prosecution, but only if obtained by valid legal process externally initiated from the employment setting), *cert. denied*, —— U.S. ——, 122 S.Ct. 38, 151 L.Ed.2d 12 (2001).

While *Brown* emphasized that reasonableness was the touchstone of Section 11 analysis, it framed the question as "whether, in the totality of these circumstances," the police conduct at issue was reasonable. 653 N.E.2d at 79–80. We believe that balancing the students' interests against the school corporation's better comports with this totality of the circumstances framework than a per se requirement of individualized suspicion.

There is precedent for this approach. In determining that the totality of the circumstances allows consideration of police officer safety, we stated that "[i]n construing and applying 'unreasonable' under Section 11, we recognize that Indiana citizens have been concerned not only with

personal privacy but also with safety, security, and protection from crime." *Mitchell v. State,* 745 N.E.2d 775, 786 (Ind.2001); *see also Carter v. State,* 692 N.E.2d 464, 466 (Ind.App.1997) ("[A]n individual's rights protected under Article I, § 11 are not absolute. We must balance competing rights and 'look to the reasonableness of the intrusion and permit brief investigatory stops based upon reasonable suspicion of criminal activity.'" (citations omitted)).

We adopt the analytical approach of *Vernonia School District 47J v. Acton* in these circumstances. Broadly stated, we will weigh the nature of the privacy interest upon which the search intrudes, the character of the intrusion that is complained of, and the nature and immediacy of the governmental concern to determine whether the Policy is reasonable under the totality of these circumstances. 515 U.S. at 658–660, 115 S.Ct. 2386.

### C

#### C–1

In weighing the nature of the privacy interest upon which a search under the Policy intrudes, the first—and chief—consideration influencing our analysis is the Linkes' status as middle and high school students.

▮▮▮ Our law does not accord students the same privacy interests as adults. "Traditionally at common law, and still today, unemancipated minors lack some of the most fundamental rights of self-determination." *Acton,* 515 U.S. at 654, 115 S.Ct. 2386. The United States Supreme Court has taken the view that while public schools are state actors subject to constitutional oversight, the nature of a school's role "is custodial and tutelary, permitting a degree of supervision and control that could not be exercised over free adults." *Id.* at 655, 115 S.Ct. 2386; *T.L.O.,* 469 U.S.

at 333, 105 S.Ct. 733. Indiana law codifies this view. For example, in passing compulsory education laws that mandate the availability of public elementary education for its citizenry, the State "has recognized that public schools stand 'in the relation of parents and guardians to the students' .... regarding [all] matters of discipline and conduct of students." *Higginbottom v. Keithley,* 103 F.Supp.2d 1075, 1080 (S.D.Ind.1999), *quoting* Ind.Code § 20–8.1–5.1–3(b) (1988).

The Linkes concede that the privacy interest of juveniles is not the same as adults' but argue that minors are actually accorded greater protection. However, the authority relied upon by the Linkes does not stand for the notion that a student's privacy interest should be granted greater weight. To the contrary, it stands for the proposition that, under certain circumstances, the State plays an active role in dictating the course of children's lives. *See Manners v. State,* 210 Ind. 648, 5 N.E.2d 300 (1936) (upholding statute making it a felony for a father to fail to provide for a child on the reasoning that "[m]inor children are the subject of the solicitude of the law because it is assumed that until maturity they are not capable of protecting themselves."); *see also Adams v. State,* 244 Ind. 460, 465, 193 N.E.2d 362, 364 (1963) (stating that juvenile courts exercise parental supervision and may properly restrain a minor's liberty in the exercise of discipline, rehabilitation, and training). Rather than bolster their argument, the Linkes' cited authority reinforces the principle that a minor's liberty interest is sometimes less than that of an adult.

▮▮▮ In light of the fact that minors in school are subject to supervision and control that could not be exercised over free adults and in view of the legislature's codification of the custodial and protective role of Indiana public schools, we find that

students are entitled to less privacy at school than adults would enjoy in comparable situations. *Cf. T.L.O.*, 469 U.S. at 348, 105 S.Ct. 733 ("In any realistic sense, students within the school environment have a lesser expectation of privacy than members of the population generally.").

■ A second factor influencing a student's privacy interest is consent. A voluntary decision to submit to random drug testing further decreases the student's legitimate expectation of privacy, increasing the likelihood of a testing policy's Section 11 reasonableness. Of course, a coerced decision is not consensual. For this reason "[t]he consent, and the circumstances in which it was given, bear upon the reasonableness" of the Policy. *See Ferguson v. City of Charleston*, 532 U.S. 67, 91, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (Kennedy, J., concurring).

NSC maintains that the Policy's requirement that student participants submit to random drug testing does not compel consent because it only applies to privileged activities. The Linkes take issue with this characterization. Citing the Supreme Court of Colorado in *Trinidad School District No. 1 v. Lopez*, the Linkes argue that it is necessary to participate in extracurricular activities to be successful in today's world. (Br. of Appellants at 26, *quoting Lopez*, 963 P.2d 1095, 1109 (Colo.1998) ("[T]he reality for many students who wish to pursue post-secondary educational training and/or professional vocations requiring experience garnered only by participating in the extracurricular activities is that they must engage in such activities. .... [I]nvolvement in a school's extracurricular offerings is a vital adjunct to the educational experience.")).

The Policy is different from that at issue in *Lopez*. The *Lopez* court noted, "two for-credit classes that are part of the regular curriculum of course offerings are inextricably linked to the 'extracurricular' activity of marching band. .... The record reflects that the consequence of enrolling in a class and failing to participate in the marching band is severe: the student will receive a failing grade." 963 P.2d at 1105. Thus, the policy under review in *Lopez* effectively gave failing grades to students who refused to submit to a drug test. The Supreme Court of Colorado found this to be unreasonable, in part because it applied to students taking the normal curriculum.

■ We are sensitive to the issue raised by the Supreme Court of Colorado. Students do not forfeit their privacy interest simply by virtue of attendance at school. "Today's public school officials .... act in furtherance of publicly mandated educational and disciplinary policies," *T.L.O.*, 469 U.S. at 336, 105 S.Ct. 733, and statutes on the books compel school attendance. *See* Ind.Code § 20–8.1–3–17 (1998). However, the Policy does not require drug testing for students enrolled in compulsory regular classes. Rather, students in voluntary activities for which they receive academic credit (co-curricular activities) are given the option of providing alternative for-credit assignments. The Policy is different from the one reviewed by the Supreme Court of Colorado in that NSC students are not deprived of the opportunity to receive academic credit from co-curricular activities if they choose not to submit to drug testing. They are only deprived from participating in the extra-curricular portion of the activities.

■ We acknowledge that this does alter the usual voluntariness calculus because, in all likelihood, at least some adverse consequences may attach to the inability to so participate. We further acknowledge that, while schools are not the only outlet for extracurricular activities, participation in school sponsored extracur-

ricular activities may benefit some students who wish to pursue post-secondary educational or professional training. However, in order for consent to be voluntary in this context, it does not follow that there be absolutely no disadvantage to a refusal to give consent. *See Ferguson*, 532 U.S. at 91, 121 S.Ct. 1281 ("[t]he person searched has given consent, as defined to take into account that the consent was not voluntary in the full sense of the word.") (Kennedy, J., concurring); *Acton*, 515 U.S. at 650, 115 S.Ct. 2386 (1995) ("[s]tudents wishing to play sports must sign a form consenting to the testing and must obtain the written consent of their parents."). The fact that refusal to agree to drug testing results in forfeiture of the opportunity to obtain certain benefits is not so weighty as to constitute forced consent. *See Todd v. Rush County Schools*, 133 F.3d 984, 986 (7th Cir.), *cert. denied* 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998).

■ A third factor influencing the privacy interests of students is whether they have volunteered for an already regulated activity. *See Acton*, 515 U.S. at 657, 115 S.Ct. 2386 ("[b]y choosing to 'go out for the team,' [student athletes] voluntarily subject themselves to a degree of regulation even higher than imposed on students generally."). There can be little doubt that student athletics are highly regulated. *See Schaill v. Tippecanoe County Sch. Corp.*, 864 F.2d 1309, 1318 (7th Cir.1988) ("the Indiana High School Athletic Association has extensive requirements which it imposes upon schools and individuals participating in interscholastic athletics."). To a lesser extent, non-athletic extracur-

ricular activities are also regulated in that various activities or clubs impose rules and requirements to which participants must comply. *See Earls v. Tecumseh Pub. Sch. Dist. No. 92*, 242 F.3d 1264, 1276 (10th Cir.) ("students participating in non-athletic extracurricular activities .... agree to follow the directives and adhere to the rules set out by the .... director of the activity."), *cert. granted*, —— U.S. ——, 122 S.Ct. 509, 151 L.Ed.2d 418 (2001).[4] The extent to which a voluntary activity is already regulated can further influence a student's Section 11 privacy interest.

### C-2

■ The character of the intrusion that is complained of provides another element contributing to reasonableness in the school context. The Linkes view urinalysis testing "as extremely intrusive, demeaning, and embarrassing." Urinalysis implicates an "excretory function traditionally shielded by great privacy." *See Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 626, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *Acton*, 515 U.S. at 658, 115 S.Ct. 2386. However, the manner in which the sample is acquired influences the ultimate weight given to the Linkes' embarrassment. *See Acton*, 515 U.S. at 658, 115 S.Ct. 2386; *Schaill*, 864 F.2d at 1318.

In *Acton*, the Supreme Court found urinalysis testing reasonable when students urinated in plain view of attendants, in part because it was no more intrusive than a visit to a standard public restroom. *See* 515 U.S. at 577, 115 S.Ct. 2338. In contrast, NSC students are escorted to a testing facility in a manner such that only one

---

4. We note that the *Earls* court found that a random drug testing policy violated the Fourth Amendment. The policy it reviewed differs from the one before us in three principal respects: (1) it did not take the same care in protecting student privacy; (2) there was much less evidence of drug abuse than has been presented here; and (3) students were required to pay for tests, thus creating a fee requirement for public school extracurricular activities.

student is present at a time. The student then enters a private room and is allowed to close the door. Attendants do not watch the student. In this case, the Policy is much less intrusive than the one examined by the Supreme Court in *Acton.*

Other important factors to consider in evaluating the character of the intrusion are what the test searches for, the amount of discretion given to the testers, and to whom results are disclosed. The Policy restricts the test to a pre-set list of banned substances. No student is compelled to provide additional private information (such as medications used). Even after a positive test, the choice of whether to disseminate additional explanatory information is left to the student. At no point in the process do school officials have discretion to choose whom to test or for what to test. Various measures are taken throughout the process to insure both the integrity of the tests and the privacy of the students, including limiting the persons privy to test results to the greatest possible extent.

■ A final factor to consider in evaluating the character of the intrusion is whether the test is punitive or preventative and rehabilitative. A punitive testing regime by a school corporation is a more severe intrusion upon a student's Section 11 privacy interest than a non-punitive search conducted in furtherance of a school's custodial and protective role. *See Acton*, 515 U.S. at 658 n. 2, 115 S.Ct. 2386; *Lopez*, 963 P.2d at 1116 (Scott, J., dissenting).

■ Section 11 protects those areas of life that Hoosiers regard as private "from unreasonable *police* activity." *See Moran*, 644 N.E.2d at 540 (emphasis added). We have also noted that protection from unreasonable searches and seizures plays a uniquely important role in the context of criminal procedure. *See Brown*, 653

N.E.2d at 79. The emphasis on preventing unreasonable law enforcement activity was a factor motivating our holding in *Baldwin v. Reagan* that reasonable suspicion of a seatbelt violation is required in order to stop a motorist for that purpose. 715 N.E.2d 332, 337 (Ind.1999).

However, a preventative or rehabilitative search conducted by a school corporation is substantively different than a search conducted to enforce the law. A preventative or rehabilitative search is inherent to a school corporation's function. Students generally understand that the "preservation of .... a proper educational environment requires close supervision" and thus the intrusion on privacy is less severe. *See T.L.O.*, 469 U.S. at 339, 105 S.Ct. 733.

In the present matter, the record shows that test results are not volunteered to law enforcement, nor are they used for any internal disciplinary function. Students are merely barred, for varying periods of time, from participating in privileged activities. As a result, the Policy must be viewed as preventative or rehabilitative. A policy involving a disciplinary function, such as suspension or expulsion from school, could be punitive and is not implicated here. The care exhibited by NSC to protect student privacy and to create a non-punitive test mitigates against the Linkes' privacy concern. A drug testing policy not so carefully crafted might not. *Cf. Ferguson*, 532 U.S. at 68, 121 S.Ct. 1281 (noting the "critical difference" between drug tests conducted without a warrant or individualized suspicion when law enforcement provides a central and indispensable feature of the policy and when drug testing is conducted for a purpose distinct from the State's general interest in law enforcement).

C–3

We last evaluate NSC's interest in drug testing certain students. NSC proffers the need to fight and deter drug abuse among its students in general and its students who act as role models and representatives of the school in particular. It also asserts a related interest in insuring the health and safety of its students. The Links counter that NSC's only legitimate interest is in stopping abuses that may occur on campus, something they argue that the Policy does not properly achieve.

That NSC has the responsibility of supervising its students and enforcing desirable behavior in carrying out school purposes is not questioned. Ind.Code § 20–8.1–5.1–3;[5] see also Ind. Const. art. VIII, § 1.[6] In the mid–1990s, drug usage in NSC's middle and high schools caused administrators to worry that they were not properly fulfilling this function. Most notably, a 1995 study of drug usage in NSC schools showed higher than average use of gateway drugs in the middle and high schools. A year later, an NSC student acquired morphine pills from a fellow student at school and subsequently died from an overdose. In response, NSC commissioned the task force of school officials and parents that created the Policy.

Deterring drug abuse by children in school is an important and legitimate concern for our schools. Drug abuse severely harms youths and impacts on a school's educational mission. " 'Maturing nervous systems are more critically impaired by intoxicants than mature ones are; childhood losses in learning are lifelong and profound'; 'children grow chemically dependent more quickly than adults and their record of recovery is depressingly poor.' " *Acton,* 515 U.S. at 661, 115 S.Ct. 2386. What is more, "the effects of a drug-infested school are visited not just upon the users, but upon the entire student body and faculty." *Id.* at 662, 115 S.Ct. 2386. NSC's interest in deterring drug use is further enhanced by the fact that three of its students have died of drug related causes since 1987, that it had scientific data illustrating a burgeoning drug problem on its middle and high school campuses, and that drug use continues to be an identifiable problem at the middle and high schools. *See Skinner,* 489 U.S. at 607, 109 S.Ct. 1402 (upholding a Government drug-testing program based on findings of drug use by railroad employees nationwide without proof that a problem existed on the particular railroads whose employees were subject to the test).

**5.** Ind.Code § 20–8.1–5.1–3 provides:

"(a) Student supervision and the desirable behavior of students in carrying out school purposes is the responsibility of a school corporation and the students of a school corporation.

(b) In all matters relating to the discipline and conduct of students, school corporation personnel stand in the relation of parents and guardians to the students of the school corporation. Therefore, school corporation personnel have the right, subject to this chapter, to take any disciplinary action necessary to promote student conduct that conforms with an orderly and effective educational system.

(c) Students must follow responsible directions of school personnel in all educational settings and refrain from disruptive behavior that interferes with the education environment."

**6.** Ind. Const. art VIII, § 1, provides:

"Knowledge and learning, general diffused throughout a community, being essential to the preservation of a free government; it should be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual scientific, and agricultural improvement; and provide, by law, for a general and uniform system of Common Schools, wherein tuition shall without charge, and equally open to all."

NSC's interest in testing the included students is further heightened by the fact that the relevant extracurricular activities all have off campus components. NSC needs a broader range of tools to insure compliance with its rules when activities occur off campus. This is due, in large part, to the fact that greater ranges of activities occur during extracurricular activities than during normal school hours. *See Webb v. McCullough,* 828 F.2d 1151, 1157 (6th Cir.1987) (affirming grant of summary judgment upholding a public school principal's search of the private hotel room of a high school student during a voluntary, off campus, school sponsored field trip). There are many more ways for a student to be injured, to endanger fellow students, to transgress school rules, or to violate the law while participating in an extracurricular off campus event (such as a band competition in another city or a non-curricular field trip) than during the relative order of school hours. *See Id.* Indeed, parents may be reluctant to allow their children to participate in voluntary school activities if schools are not permitted to take the reasonable steps taken here by NSC to prevent drug use. *See Id.*

If drug abuse increases the physical danger of participation in a school-sponsored activity, a school corporation's interest in deterring drug abuse becomes stronger. This is undoubtedly the case with school athletics. *See Acton,* 515 U.S. at 662, 115 S.Ct. 2386 ("[a]part from psychological effects . . . . the particular drugs screened by the District's Policy have been demonstrated to pose substantial physical risks to athletes."). Likewise, we note that driving while intoxicated presents significant physical risks to drivers, their passengers, and pedestrians. *See Todd v. Rush County Schools,* 983 F.Supp. 799, 806 (S.D.Ind.1997), *aff'd* 133 F.3d 984 (7th Cir.), *cert. denied,* 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998).

While the risk of physical injury seems remote in the other activities covered by the Policy, NSC argues that its interest in promoting the health and safety of these students is equivalent to that of student athletes and student drivers. It is true that "successful extracurricular activities require healthy students," *see Todd v. Rush County Schools,* 133 F.3d 984, 986 (7th Cir.1998), but the absence of increased physical danger means that NSC's general interest in health and safety is not increased in these situations. After all, healthy students are important to most of what a school does and the need does not grow simply because a student chooses to participate in an activity. NSC further maintains, however, that its interest in deterring student drug abuse is increased by the facts that student athletes and student participants in extracurricular activities are role models for other students and are representatives of their schools in the community. The Linkes respond that there is "nothing in the record to demonstrate that band members are viewed as role models or student leaders."

The record does not address whether their peers view students participating in the tested activities as role models. NSC's interest in testing may well be heightened were such a fact shown. *See Acton,* 515 U.S. at 662–663, 115 S.Ct. 2386. Nonetheless, it is evident that NSC holds the participants out as role models by submitting the participants to additional rules above and beyond "normal," and by sending participants to community functions as school representatives. The fact that NSC has identified a drug problem at its middle and high schools gives it an interest in experimenting with methods to deter drug use. This aspect of the Policy supports NSC's interdiction efforts by giving students who represent the school in an organized activi-

ty a valid response to peers who may pressure them into using drugs.

*Chandler v. Miller*, 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1995), in which the Supreme Court invalidated a program of suspicionless drug testing of Georgia political candidates, does not suggest a different conclusion. In *Chandler*, the Supreme Court determined that suspicionless drug testing of candidates was solely symbolic because (1) the tests were not based on evidence of a drug problem among the State's elected officials, (2) those officials typically do not perform high risk, safety sensitive tasks, and (3) the tests immediately aided no interdiction effort. *Id.* at 321–322, 117 S.Ct. 1295. The circumstances creating context for the Policy under our review are different. In addition to the fact that it is public school students who are tested here, the Policy has been prompted by concrete evidence of drug abuse by NSC junior and high school students (some of whom engage in safety sensitive tasks) and all testing is merely a component of a broader interdiction effort created by local officials in conjunction with interested parents. *Chandler* acknowledged the "critical" importance of context, stating that school drug tests are different because "a local government bears large 'responsibilities, under a public school system, as guardian and tutor of children entrusted to its care.'" *Id.* at 316, 117 S.Ct. 1295. It also emphasized that "[a] demonstrated problem of drug abuse, while not in all cases necessary to the validity of a testing regime, would shore up an assertion of special need for a suspicionless general search program." *Id.* at 319, 117 S.Ct. 1295 (citation omitted).

### D

■ In light of the totality of the circumstances, the Policy does not violate

Section 11. Our constitution does not forbid schools from taking reasonable measures to deter drug abuse on their campuses but they must do so with due regard for the rights of students.

We reiterate that our evaluation of this matter is particularly influenced by the facts that students' privacy interests are less than those of adults and that both students and their parents or guardians must give consent. We have also been influenced in general by schools' custodial and protective interest in their students and in particular by the fact that the Policy was created with parent involvement as an element of a comprehensive interdiction program. Furthermore, the higher than average rate of drug use at NSC middle and high schools, the recent drug related deaths, and the continued presence of illegal drugs on campus strengthens NSC's legitimate interest in this matter. We do note that the strength of NSC's interest in deterring drug abuse is not uniform for all students. In this regard, the Policy is most defensible in regard to athletes and student drivers. The school's interest in protecting these students is increased by the risk of physical danger and, in the case of student athletes, by the fact that they represent the school as role models. While the rationale for testing students involved in co-curricular activities is not so strong, for the reasons already stated, it does not violate Section 11 in this case.

### II

■ The Linkes also argue that the Policy violates the Privileges and Immunities Clause, art. I, § 23, of the Indiana Constitution ("Section 23"). Section 23 provides:

The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the

same terms, cannot equally belong to all citizens.

In the watershed case of *Collins v. Day*, 644 N.E.2d 72 (Ind.1994), we held that the analytical framework required to resolve Section 23 claims examines whether "the disparate treatment . . . [is] reasonably related to inherent characteristics which distinguish the unequally treated classes." *Id.* at 80. *Collins* requires that the challenger bear the burden "to negative every reasonable basis for the classification." *Id.* at 81. This is because of the substantial deference due the enactment. *Id.* at 80. In addition, "the preferential treatment must be uniformly applicable and equally available to all persons similarly situated." *Id.*

The Linkes' contend that Section 23 is violated because a class of students who participate in certain extracurricular activities [7] are subjected to random drug testing while students who participate in other extracurricular activities [8] are not.

We find that the Linkes have not carried their burden to "negative every reasonable basis" for random drug testing imposed upon the class of which they are a member. Under *Collins*, we determine whether there are inherent distinctions between the activities subject to the Policy and those not. Largely for the reasons set forth in Part I–C–3 *supra*, we find the "reasonable relationship" test met.

The Policy focuses on those activities in which the participating students represent the school outside of the normal school day hours, receive special privileges as a result of their participation, or place the partici-

pating student in a leadership or role model position. The school activities not covered are strictly in-school activities that take place during school hours. Consequently, the students who engage in the school activities not covered by the Policy do not represent the school by publicly performing or working within the community. While the Linkes argue that the newspaper and yearbook are extracurricular activities requiring students to "engage in activities outside of the school day," Brief of Appellant 30, these activities are purely curricular. (R. at 76.) These classes are taken for a grade and do not require any activity outside the normal school day. (*Id.*)

We agree with NSC that testing those students who are at an increased risk of physical harm or are role models and leaders by virtue of their participation in certain extracurricular activities is "reasonably related to achieving the school's purpose in providing for the health and safety of students, and undermining the effects of peer pressure by providing a legitimate reason for students to refuse to use illegal drugs and by encouraging students who use drugs to participate in drug treatment programs." (Trial Court's Conclusions of Law, R. at 509). We find no violation of Section 23.

### Conclusion

Having previously granted transfer, we now affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, J., concur.

BOEHM, J., dissents with separate opinion in which RUCKER, J., concurs.

---

7. Those activities are academic teams, drama, Future Farmers of America, National Honor Society, student government, and Students Against Drunk Driving.

8. Activities not subject to the Policy include the Euchre Club, New Student Q & A, Ecolo-

gy Club, Fellowship of Christian Athletes, Foreign Language Club, Peer Helpers, Sunshine Society, Newspaper, Yearbook, Science Club, Teen Issues, Sports Memorabilia, and Chess Club.

BOEHM, Justice, dissenting.

I respectfully dissent. The majority adopts the methodology of *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), and concludes that NSC's drug testing fits within a very narrow exception to the general probable cause requirement, the so-called "special needs" exception. However, assuming it is proper to analyze Indiana constitutional claims in the *Vernonia* framework, I do not agree that NSC has carried its burden of proving that its program meets the standard of reasonableness the "special needs" doctrine requires. Rather, this program amounts to imposition of a general random testing program with no sound footing in concern for the educational mission of the school corporation, as opposed to general law enforcement. Nor is there a justification for selecting these students from the general school population.

For many of the same reasons, I conclude that NSC's program violates the requirement of Article I, Section 23 of the Indiana Constitution that a classification must be reasonably related to the characteristics—in this case, participation in certain school activities—that define the class.

## I. What it Means to Have "Special Needs"

Three cases, in particular, are important to understanding why NSC's random drug testing program violates Article I, Section 11 of the Indiana Constitution.

### A. *New Jersey v. T.L.O.*

The "special needs" doctrine, in the context of searches by school officials, has its roots in *New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), where the United States Supreme Court held that the Fourth Amendment's usual probable cause standard should not apply in a school setting. In *T.L.O.*, a teacher discovered two students smoking in a school lavatory in violation of school rules. The teacher took the pair to the assistant principal's office, where T.L.O., in response to the assistant principal's questioning, denied having ever smoked. Searching T.L.O.'s purse, the assistant principal found a pack of cigarettes along with various drug paraphernalia. T.L.O. was later adjudged a delinquent.

T.L.O. claimed that the search violated the Fourth Amendment. The Court agreed that the Fourth Amendment applied to searches conducted by school officials, but nevertheless concluded that school officials may conduct searches in the absence of the requirements imposed by the Fourth Amendment on other governmental searches. *Id.* at 340, 105 S.Ct. 733. The Court offered this explanation why a level of suspicion lower than that of probable cause is required for searches conducted by school officials, at least in the context of searches for evidence of school rule violations:

> [T]he legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search. Determining the reasonableness of any search involves a twofold inquiry: first, one must consider "whether the ... action was justified at its inception," *Terry v. Ohio*, 392 U.S. [1], at 20 [88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]; second, one must determine whether the search as actually conducted "was reasonably related in scope to the circumstances which justified the interference in the first place," *ibid.* Under ordinary circumstances, a search of a student by a teacher or other school official will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of

the school. Such a search will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction.

*Id.* at 341–42, 105 S.Ct. 733. However, the Court also emphasized that there were limits to the authority of school officials to conduct a search under this lowered constitutional bar. Specifically, "the reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." *Id.* at 343, 105 S.Ct. 733.

Justice Blackmun's concurring opinion introduced the phrase "special needs" into the public discourse on school searches. He expressed concern that a balancing test might become the rule rather than the exception. To curb this potential, he wrote, "Only in those exceptional circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable, is a court entitled to substitute its balancing of interests for that of the Framers." *Id.* at 351, 105 S.Ct. 733 (Blackmun, J., concurring). Searches in a school setting based on a lower standard are appropriate, he concluded, because of the need for immediate action on the part of teachers attempting to maintain order in the classroom.

B. *Vernonia School District 47J v. Acton*

The next principal case is *Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), on which the majority relies to justify its conclusion that NSC's drug testing program is reasonable. In *Vernonia,* the United States Supreme Court upheld a random drug testing program instituted by an Oregon school district. The plan called for testing of athletes only. In upholding this plan, the Court specifically endorsed Justice Blackmun's concurrence in *T.L.O.* and found that, on the facts presented, the Vernonia school district established a "special need" justifying the imposition of drug testing on a specific group of students. The Court relied heavily on the facts found by the district court that the Vernonia school district was faced with an "immediate crisis" and had been able to target the instigators as coming from the student-athlete population. *Id.* at 663, 115 S.Ct. 2386.[1] The Court relied on *T.L.O.* for the proposition that, in the public school context, a search unsupported by probable cause can be constitutional when the district demonstrates "special needs," i.e. where strict adherence to the probable cause requirement would undercut " 'the substantial need of teachers and administrators for freedom to maintain order in the schools.' " *Id.* at 653, 115 S.Ct. 2386 (quoting *T.L.O.,* 469

1. Specifically, the Supreme Court cited district court findings that:

   Between 1988 and 1989 the number of disciplinary referrals in Vernonia schools rose to more than twice the number reported in the early 1980's, and several students were suspended. Students became increasingly rude during class; outbursts of profane language were common.

   Not only were student athletes included among the drugs users but, ... athletes were the leaders of the drug culture.

   . . . .
   "[A] large segment of the student body, particularly those involved in interscholastic athletics, was in a state of rebellion, ... [d]isciplinary actions had reached 'epidemic proportions,' and ... the rebellion was being fueled by alcohol and drug abuse as well as by the students' misperceptions about the drug culture."
   515 U.S. at 649, 662–63, 115 S.Ct. 2386.

U.S. at 341, 105 S.Ct. 733). The Court cited three factors supporting the reasonableness of the Vernonia program—the decreased expectation of privacy of the student athletes, the relative unobtrusiveness of the search, and the severity of the need met by the search.

None of these three is present in force to support NSC's plan. NSC's program applies to athletes, student drivers, and participants in a wide range of extra-curricular and co-curricular activities from Future Farmers of America to the school band. NSC's evidence of substance abuse in its schools is a survey conducted by the Indiana Prevention Resource Center in 1995 and given to students in grades seven through ten. Notably absent from the results is any data suggesting that students who claimed to have used a given substance also participated in one of the activities covered by NSC's testing program. The testing intrudes on students who in no way qualify for the lessened expectation of privacy some cases, like *Vernonia,* have attributed to athletes.

### C. *Chandler v. Miller*

In *Chandler v. Miller,* 520 U.S. 305, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997), the United States Supreme Court explained in further detail when it is appropriate to apply the "special needs" doctrine. The Court in *Chandler* found unconstitutional Georgia's policy of requiring certain candidates for public office to submit to drug testing. Justice Ginsburg, writing for an eight-member majority, explained that to successfully make the case that a "special need" exists, a government actor must demonstrate a "concrete danger demanding departure from the Fourth Amend-

ment's main rule." *Id.* at 319, 117 S.Ct. 1295.

Georgia argued that its testing policy passed constitutional muster based on the Court's earlier decisions upholding suspicionless testing of student athletes, *Vernonia,* 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564, certain United States Treasury employees, *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), and certain railroad employees, *Skinner v. Ry. Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The Court explained that the employees subject to testing in *Von Raab* were "directly involved [in] drug interdiction," [2] *Skinner* offered "evidence of drug and alcohol abuse by railway employees engaged in safety-sensitive tasks," and *Vernonia* responded to an "immediate crisis prompted by a sharp rise in students' use of unlawful drugs." Georgia's plan to screen candidates for public office failed to address a "concrete danger," the Court explained, because: (1) the record did not suggest that the hazards argued by the state were "real and not simply hypothetical for Georgia's polity"; (2) the requirement was not well designed to identify drug users; (3) it was feasible, within the environment of public office, to note erratic conduct that would lead to a suspicion of drug use; and (4) the risk to public safety was neither substantial nor real. 520 U.S. at 319–23, 117 S.Ct. 1295.

Although this case and *Vernonia* both address school programs, for several reasons NSC's plan is closer to Georgia's plan for wanna-be officeholders than the Vernonia plan for its students. First, the survey and other evidence relied upon by NSC may establish a drug problem, but not

---

**2.** The Court rejected the argument that *Von Raab* carried greater weight, and admonished, *"Von Raab* must be read in its unique

context." *Chandler,* 520 U.S. at 321, 117 S.Ct. 1295.

among the categories of students tested. Second, the testing, though intended to prevent school-wide drug use, identifies only drug users among the population of students who submit to the program. Third, it is feasible, as NSC's own policy makes clear, for NSC officials to determine when a reasonable suspicion of drug use exists. Fourth, NSC has not shown any evidence, of the type presented in *Vernonia*, of drug use as a source of significant problems in conducting the school's educational program.

## II. Applying the "Special Needs" Analysis to NSC's Program

I agree with the majority that the relevant inquiry under Article I, Section 11 of the Indiana Constitution is whether, given the totality of the circumstances, the searches conducted by NSC are reasonable. *Brown v. State*, 653 N.E.2d 77, 79–80 (Ind.1995). In this respect, the Indiana Constitution is very similar, if not identical, to the formulation adopted for the Fourth Amendment in *Vernonia*: reasonableness under all the circumstances. 515 U.S. at 652, 115 S.Ct. 2386 ("[T]he ultimate measure of the constitutionality of a governmental search is 'reasonableness.' "). The majority concludes that the appropriate "circumstances" to examine are the same as those balanced by the Court in *Vernonia*: the nature of the privacy interest; the character of the intrusion; and the nature and immediacy of the governmental concern. So far, so good. But, in applying the reasoning of *Vernonia* in light of *Chandler*, I arrive at a different conclusion from the majority's.

### A. Overcoming the Linkes' Privacy Interests

The majority finds the Linkes' privacy interests of minimal weight based on three propositions: (1) students' privacy interests are less than those of adults; (2)

students "consent" to the searches; and (3) the tested students are held out by NSC as "role models." I think the first is true only to a limited extent, and the other two are not true at all.

### 1. *Extent of Control Over Students*

The majority contends that the Linkes' privacy interests deserve lesser protection than Article I, Section 11 would normally demand because schools are allowed a degree of "supervision and control that could not be exercised over free adults." I agree that Indiana law generally supports that view. However, a school's "degree of supervision" is not without its limits. The majority relies on the notion that schools stand in the relation of parents and guardians to its students in matters of conduct and discipline. This may justify the imposition of drug testing when matters of conduct and discipline are at issue. But it does not carry equal weight when suspicionless searches are conducted as a matter of routine. Indeed, in *T.L.O.*, the United States Supreme Court cautioned against such a laissez-faire view of the role of school officials who conduct searches:

If school authorities are state actors for purposes of the constitutional guarantees of freedom of expression and due process, it is difficult to understand why they should be deemed to be exercising parental rather than public authority when conducting searches of their students. More generally, the Court has recognized that "the concept of parental delegation" as a source of school authority is not entirely "consonant with compulsory education laws." *Ingraham v. Wright*, 430 U.S. 651, 662 [97 S.Ct. 1401, 51 L.Ed.2d 711] (1977). Today's public school officials do not merely exercise authority voluntarily conferred on them by individual parents; rather, they act in furtherance of publicly man-

dated educational and disciplinary policies.... In carrying out searches and other disciplinary functions pursuant to such policies, school officials act as representatives of the State, not merely as surrogates for the parents....

469 U.S. at 336, 105 S.Ct. 733. It is also noteworthy that, although the education of Indiana's students is one of the most highly regulated enterprises of our state government, nowhere in the specifically enumerated powers and duties of this state's school corporations has the legislature given explicit authority for random drug testing of students.[3]

### 2. *"Consent" to Searches and "Already Regulated Activities"*

Among the categories of students affected by the NSC program are those enrolled in some for-credit courses whose activities take place off school premises. The majority concludes that, because alternative for-credit assignments are available to take the place of the portion of the course that triggers the testing requirement, the decision whether to submit to testing is "voluntary." But the effects of refusing to submit to drug testing in those courses may be quite harsh. Consider, for example, a member of the choir who hopes to enter a performing arts program in college. He or she is permitted, as the majority points out, to participate in "alternative for-credit assignments," but is denied the opportunity to perform in public with the rest of the chorus. When the time comes to apply to the performing arts program, if that student refuses to participate in the "voluntary" program, he or she may be able to document a high grade in choir, but has a gaping void in performance experience.

The majority identifies one set of for-credit coursework as "compulsory regular classes," and describes participation in everything else "voluntary." But the aspiring vocalist's appearance in public concerts is no more a "voluntary" activity than the future math major's electing calculus, when algebra will satisfy the high school diploma requirements. *Cf. Trinidad Sch. Dist. No. 1 v. Lopez*, 963 P.2d 1095, 1109 (Colo.1998) (extra-curricular activities are a "vital adjunct to the educational experience"). That the student receives academic credit from the alternative program does not change the fact that the student is essentially given a different course from the one provided his or her peers, because of a "voluntary" decision not to take a drug test.

I agree that participation in certain extra-curricular activities may open the door to some fashion of drug testing. Athletics have traditionally been the primary target of such programs. *See, e.g., Vernonia* (student-athletes subject to testing because they were the "leaders" of the drug culture and instigators of severe discipline problems). There may well be some basis for drug testing as a safety measure in activities accompanied by significant physical stress. I find far less tenable the notion that participation in non-athletic extracurriculars also opens the door to such an intrusive practice. There is nothing peculiar about National Honor Society, for instance, that suggests that its members must "subject themselves, by virtue of their participation ... to regulations that further reduce their expectation of privacy." *Joy v. Penn–Harris–Madison Sch. Corp.*, 212 F.3d 1052, 1063 (7th Cir.2000). As more fully developed in Part II.C, I believe that in order to be reasonable under all the circumstances, the scope of the

---

**3.** By contrast, the legislature has specifically spelled out the procedure for locker searches.

Ind.Code § 20–8.1–5.1–25 (1998).

testing program must bear some relation to the identified issue the program is meant to address. The NSC plan fails that test.

### 3. *The "Role Model" Theory*

The majority concedes that the record "does not address whether their peers view students participating in the tested activities as role models," but finds persuasive the fact that NSC holds the affected students out as such. This writer is further removed from high school than his colleagues. But even a casual reviewer of pop culture must view with extreme skepticism the undocumented claim that participants in this broad list of activities are all, or even predominantly, viewed by their peers as role models.[4] In any event, whether the affected party is or is not held out as a "role model" is not adequate to justify NSC's program on a "special needs" basis. As the U.S. Supreme Court put it, "[I]f a need of the 'set a good example' genre were sufficient to overwhelm a Fourth Amendment objection, then the care this Court took to explain why the needs in *Skinner, Von Raab,* and *Vernonia* ranked as 'special' wasted many words in entirely unnecessary, perhaps even misleading, elaborations." *Chandler,* 520 U.S. at 322, 117 S.Ct. 1295. Rather than supporting the need for testing, the fact that NSC advances its "role model" theory underscores the paucity of evidence that testing of the affected students has any relation to NSC's drug problem.

### B. *Character of the Intrusion*

### 1. *Article I, Section 11 Applies Equally to All Government Agencies*

I disagree with the majority to the extent it suggests that a search is less intru-

sive if conducted by school officials, rather than police. I am aware of no authority suggesting that Article I, Section 11 applies more stringently to police activity than that of other government agencies. Nor does the text of Article I, Section 11 support such a result. The majority emphasizes the words "police" and "law enforcement" in the cited portions of *Baldwin v. Reagan,* 715 N.E.2d 332 (Ind.1999), *Brown,* 653 N.E.2d 77 (Ind.1995), and *Moran v. State,* 644 N.E.2d 536 (Ind.1994) to suggest that Article I, Section 11 carries greater weight in those situations than when school officials' conduct is at issue. Those cases referred to police activity because the seizures in those cases were conducted by police officers. There is nothing in those cases to suggest a different result if the seizure were conducted by a different arm of government. Indeed, other cases frequently refer to the constraint on searches by government in general, not just by the police. *See Moran,* 644 N.E.2d at 540 ("The protection afforded [by Article I, Section 11] is against official and not private acts."); *Hutchinson v. State,* 477 N.E.2d 850, 853 (Ind.1985) ("The constitutional prohibitions against unreasonable searches and seizures provide protection from such acts by the government."); *Torres v. State,* 442 N.E.2d 1021, 1023 (Ind.1982) (same); *cf. New Jersey v. T.L.O.,* 469 U.S. at 335, 105 S.Ct. 733 ("[T]his Court has never limited the [Fourth] Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police.").

I agree with the majority that, in some cases, suspicionless searches conducted by schools have been upheld under circum-

---

**4.** I cite the recent motion picture "American Pie II," which I confess to having viewed by reason of friendship with the parents of its director, whom I have known from child-hood. I believe most of us could provide more persuasive authority from our own experiences in high school.

stances that would preclude a search by law enforcement. But it is not the identity of the searching government agents that makes this so. It is the nature of the intrusion and the reasons justifying it. That a school, rather than the police, is charged with the unreasonable conduct is not an automatic invitation to apply the mandate of Article I, Section 11 with less force.

2. *Preventative/Rehabilitative versus Punitive Purposes*

I do not place much stock in the fact that the results of NSC's drug tests are not routinely volunteered to law enforcement authorities. Regardless of the stated purpose of the testing, I do not agree with the majority that "[a] preventative or rehabilitative search is inherent to a school corporation's function." Indeed, I find no support for such a notion. A school corporation's inherent function is to educate, not to monitor an arbitrarily defined category of students for the use of drugs, alcohol or nicotine, or compliance with other laws. The testing conducted in *Vernonia* was necessary to that school's inherent educational function because the education of the students was severely affected by the "immediate crisis prompted by the sharp rise in students' use of unlawful drugs." *Chandler,* 520 U.S. at 319, 117 S.Ct. 1295. This crisis included severe disruption of classroom activities.

In any case, NSC's program is not the method of preserving a proper educational environment envisioned by *T.L.O.,* on which the majority relies. *T.L.O.* dealt with smoking in the school and the ability of teachers and principals to respond swiftly to address conduct in the educational environment without adhering to the formal requirements of the Fourth Amendment. These situations certainly may require immediate action. But that is not

the case presented by NSC. Nor does NSC argue that its students have run amok, as was the case in *Vernonia.* Finally, there is no claim that the testing of these groups of students, distinct from the population as a whole, has any relation to NSC's perceived drug problem. The Tenth Circuit, in *Earls v. Tecumseh Pub. Sch. Dist. No. 92,* 242 F.3d 1264 (10th Cir.2001), *cert. granted,* —— U.S. ——, 122 S.Ct. 509, 151 L.Ed.2d 418 (Nov. 8, 2001), invalidated a drug testing program for that reason. The majority distinguishes *Earls* based on differences between its policy and NSC's. But Earls turned not on the nature of the school district's policy, but on the classification of students subjected to the searches. The Tenth Circuit saw "little efficacy in a drug testing policy which tests students among whom there is no measurable drug problem." 242 F.3d at 1277. Finally, the "preventative" nature of NSC's program proves too much. If it is a legitimate objective, it gives reason for NSC to test every student. *Willis v. Anderson Cmty. Sch. Corp.,* 158 F.3d 415, 422 (7th Cir.1998), *cert. denied,* 526 U.S. 1019, 119 S.Ct. 1254, 143 L.Ed.2d 351 (1999) ("If [deterrence] were the only relevant consideration, *Vernonia* might as well have sanctioned blanket testing of all children in public schools. And this it did not do."). Of course, such testing is not permissible. *Cf. Joy,* 212 F.3d at 1067 ("[T]he case has yet to be made that a urine sample can be the 'tuition' at a public school.").

As T.L.O. reminded us: "[T]he reasonableness standard should ensure that the interests of students will be invaded no more than is necessary to achieve the legitimate end of preserving order in the schools." The rights of NSC's students— or at least the ones NSC has chosen to test—should be subject to no more of an intrusion than necessary to achieve NSC's interest in preserving order in its schools.

In my view, the issue is not, as the majority's reasoning suggests, whether NSC's policy is comparable to those imposed at other schools and documented in other cases. Rather it is whether NSC's program, and its suspicionless testing of broad categories of students, is justified at all. It is incumbent upon NSC to prove this, and its failure to do so leaves its program well short of complying with Article I, Section 11.

### C. NSC's Governmental Concern and Efficacy of its Program

#### 1. NSC Presents No "Concrete Danger" as to the Students it Tests

The final factor in the "special needs" balance is the nature and immediacy of NSC's concern and the efficacy of its testing program in addressing it. *Vernonia*, 515 U.S. at 660, 115 S.Ct. 2386. The majority's treatment of *Vernonia* suggests that the phrase "special need" means nothing more than that a school may identify a "drug problem" and thereafter impose random drug testing on any student engaged in an extra- or co-curricular activity. I do not read *Vernonia* that broadly. NSC carries the burden of proving why its searches fall within the "special needs" doctrine, as applied in *Vernonia*, and later clarified in *Chandler*. In my view, it fails to establish the "concrete danger" to which its program responds, or—assuming the presence of a concrete danger—that the program in its present form is tailored to address it.

In *Chandler*, the United States Supreme Court explained that "the proffered special need for drug testing must be substan-tial—important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion." 520 U.S. at 318, 117 S.Ct. 1295. To invoke the "special needs" doctrine, the proponent of such a testing program must demonstrate a "concrete danger." *Id.* at 319, 117 S.Ct. 1295. In *Vernonia*, the "concrete danger" with regard to the school's student athletes was evident and described as a "state of rebellion." 515 U.S. at 662–63, 115 S.Ct. 2386. A variety of problems in the school environment were cited. NSC argues that the survey results and the deaths of two students in a ten-year period justify the program it has put into place. But neither of these circumstances involved the classroom disruption cited in *Vernonia*, and NSC's superintendent could not point to any increase in discipline problems attributable to substance abuse. It may not take an "epidemic" before a school justifiably institutes a drug testing program. But it must take more than the evidence presented by NSC. If not, Article I, Section 11 may fairly be said to provide little, if any, protection to Indiana's students.

The concerns cited by NSC are of course significant. But even if they rose to the level sufficient to support some testing program, NSC's program is not justified by its evidence. In *Joy*, the Seventh Circuit addressed an Indiana school's testing policy similar to NSC's. Although the particulars of the policy are unimportant to the present case, the Seventh Circuit's analysis is instructive.[5] The court assessed the nature of the government's interest, in part, by examining whether a

---

**5.** The court in *Joy* upheld the policy at issue as to its testing of students participating in extra-curricular activities, but the only apparent reason for that conclusion was the panel's compulsion, under stare decisis, to follow the Seventh Circuit's earlier holding in *Todd v.* *Rush County Sch.*, 133 F.3d 984 (7th Cir. 1998), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68, 142 L.Ed.2d 53 (1998), upholding a similar policy. For the reasons expressed throughout this opinion, I disagree with the reasoning in *Todd*.

correlation existed between the defined test population and the abuse. NSC's evidence of substance abuse in its schools is a survey given to students in grades seven through ten. However the results do not suggest a correlation between the percentage of students claiming to have used a given substance and those students who participate in an activity covered by NSC's testing program. The survey cited by NSC may indeed "demonstrate a ... 'correlation' between student drug use and a need to test." What it does not do is demonstrate a correlation between drug use among the general student population and a need to test the students who are subject to the program. *Cf. id.* at 685, 115 S.Ct. 2386 (O'Connor, J., dissenting) (criticizing the school district's decision to test student athletes as "a choice that appears to have been driven more by a belief in what would pass constitutional muster ... than by a belief in what was required to meet the District's principal disciplinary concern."). NSC cites *Joy* and *Vernonia* in support of its claim that "[u]nder a reasonableness standard the federal courts have found that findings like this do in fact provide a basis for testing." The majority appears to accept this argument. I think this misses the point of *Joy* and *Vernonia*.

Here, as in *Joy*, NSC "has not proven, or even attempted to prove, that a correlation exists between drug use and those who engage in extracurricular activities or drug use and those who drive to school." 212 F.3d at 1064. Thus, NSC's program amounts to "dividing the students into broad categories and drug testing on a category-by-category basis, which allows for drug testing for all but the most uninvolved and isolated students." *Id.* (citing *Willis*, 158 F.3d at 423). *Willis* appropriately described such a program as "one insidious means toward blanket testing." 158 F.3d at 423.

2. *Suspicion–Based Testing is Feasible*

One driving force in the United States Supreme Court's opinion in *Vernonia* was the Court's conclusion that a program based on individualized suspicion would entail "substantial difficulties—if it [were] indeed practicable at all" in order to handle the "immediate crisis" present in the Vernonia school district. As explained in Part II.C.1, NSC does not proffer evidence of a "concrete danger" of an immediate nature as to the students it tests. Further, as the majority points out, NSC's program not only entails random testing of the selected groups of students, but also provides that "[s]tudents may also be entered into the testing program at the request of their parent ... *when a student shows signs of drug use that provides reasonable suspicion to search a student.*" (emphasis added). By its own terms, NSC's policy purports to· have the ability to determine when a "reasonable suspicion" is present for a given student.

I recognize and agree that suspicion-based searches can lead to abuses if the grounds for suspicion are not sufficiently articulable. As noted in *State v. Gerschoffer*, a scheme of random searches may be less subject to abuse in the form of profiling or arbitrary enforcement than one that requires reasonable suspicion. 763 N.E.2d 960 (Ind.2002) (citing Akhil Reed Amar, *Fourth Amendment First Principles*, 107 Harv. L.Rev. 757, 809 (1994)). Nevertheless, the broader the net cast, and the weaker the case for any program at all, the less persuasive this consideration becomes. Thus airport searches of everyone or of randomly selected passengers may be very reasonable under current circumstances. But NSC's program subjects nearly eighty percent of its middle and high school students to random tests, based on this very tenuous claim of a "concrete danger."

In *Willis,* 158 F.3d at 421, the Seventh Circuit Court of Appeals stated, "Under the *Vernonia* formulation, courts consider the feasibility of a suspicion-based search when assessing the efficacy of the government's policy." The testing program in *Willis* required students who were suspended for three or more days to submit to urinalysis upon their return. Willis was suspended for fighting, but refused to undergo testing upon his return. The Anderson policy, like NSC's policy, was implemented "to help identify and intervene with those students who are using drugs as soon as possible and to involve the parents immediately." *Id.* at 417. The Seventh Circuit, holding the program violated the Fourth Amendment, found it significant that "the Corporation has not demonstrated that a suspicion-based system would be unsuitable, in fact would not be highly suitable." *Id.* at 424–25. The court noted:

> As a practical matter, it may be that when a suspicion-based search is workable, the needs of the government will never be strong enough to outweigh the privacy interests of the individual. Or, stated slightly differently, perhaps if a suspicion-based search is feasible, the government will have failed to show a special need that is "important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."

*Id.* at 421 (quoting *Chandler,* 520 U.S. at 318, 117 S.Ct. 1295). Whether a suspicion-based system is feasible is just one factor in our totality of the circumstances analysis, but I believe—as *Willis* illustrates—it is a significant one in the balance of whether the system is reasonable. Given the fact that NSC's own policy contemplates suspicion-based testing for some students, what is practicable for some is practicable for all.

## III. Article I, Section 23 Concerns

Article I, Section 23 of the Indiana Constitution states: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens." I agree with the majority's recitation of the standard in *Collins v. Day,* 644 N.E.2d 72 (Ind.1994). However, for many of the reasons stated in Part II, I believe NSC's testing program runs afoul of Article I, Section 23.

Section 23 requires that governmental classifications be based on inherent characteristics of the classified group and that the classifications be reasonably related to the characteristics that define the group. *Collins,* 644 N.E.2d at 79. Like many legislative classifications, this is one that defines a group that has individuals entering and leaving all the time as students join and drop out of various activities. As the majority points out, defining the group by membership in these activities meets the *Collins* requirement of "inherent characteristics which distinguish" NSC students who are tested from NSC students who are not tested. However, the stated purpose of NSC's testing is to "provid[e] for the health and safety of students, and undermin[e] the effects of peer pressure by providing a legitimate reason for students to refuse to use illegal drugs and . . . encourag[e] students who use drugs to participate in drug treatment programs." Nothing in that stated purpose signifies that NSC is more concerned about the health and safety of the students who participate in the regulated activities than those who do not. Nor is there anything about the covered categories of students to suggest that those students are more susceptible to the effects of peer pressure than their non-tested colleagues. There-

fore, I cannot agree that the disparate treatment of requiring testing of some students rather than others is in any way "reasonably related" to the distinction NSC makes between them.

### Conclusion

In conclusion, I would find NSC's testing program, in its current form, invalid under both Article I, Section 11 and Article I, Section 23 of the Indiana Constitution. NSC has not presented significant evidence of a concrete danger requiring the implementation of its policy, as it currently stands. At the very least, NSC has not presented any evidence of a severe drug or discipline problem among the tested categories of students. NSC's distinction between the tested and untested students has no rational basis, and its testing program (a) fails to overcome the Linkes' privacy interest, under the *Vernonia* analysis, for substantial lack of efficacy, and (b) fails the *Collins* equal rights and privileges analysis because the distinction is not "reasonably related" to the policy's stated purpose.

The majority contends that, having "identified a drug problem ... gives [NSC] an interest in experimenting with methods to deter drug use." I agree that, if a drug problem is present at NSC, it certainly has the right to experiment and determine the most effective method of combating the problem. However, that experimentation must have a constitutionally valid form.

RUCKER, J., concurs.